NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-733

STATE OF LOUISIANA

VERSUS

ELVIN BRYANT JINKS, JR.
-AKA- ELVIN JINKS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 158217
HONORABLE PENELOPE RICHARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Candyce G. Perret, Judges.

CONVICTION AND SENTENCE AFFIRMED; UNIFORM COMMITMENT ORDER REMANDED FOR CORRECTION.

Cooks, J., dissents and assigns written reasons.

**Sherry Watters**
**Louisiana Appellate Project**
**Post Office Box 58769**
**New Orleans, LA 70158-8769**
**(504) 723-0284**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Elvin Bryant Jinks, Jr.**

**Jennifer Jones**
**Assistant District Attorney**
**W. Thomas Barrett, III**
**Post Office Drawer 280**
**Cameron, LA 70631**
**(337) 775-5713**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PERRET, Judge.**

Defendant, Elvin Bryant Jinks, Jr., was charged with one count of aggravated crime against nature, a violation of La.R.S. 14:89.1, wherein the victim, his stepdaughter, was under the age of thirteen at the time of the offense, which occurred between the spring of 2016, and the fall of 2016. Defendant pled not guilty. Following a jury trial on April 25, 2018, Defendant was found guilty by a ten-to-two jury verdict and sentenced to the minimum sentence of twenty-five years at hard labor without the benefit of parole, probation, or suspension of sentence, with credit for time served. Defendant appeals alleging that the trial court erred in proceeding with sentencing without the proper statutory delay, that the trial court erred in prohibiting testimony regarding the victim's credibility, and that a new trial should be granted because a non-unanimous verdict does not satisfy due process. On appeal, we affirm Defendant's conviction and sentence, but remand for the Uniform Commitment Order to be corrected.

**FACTS AND PROCEDURAL HISTORY:**

On November 7, 2016, the victim, K.R.W.[1], reported to her school counselor that her stepfather had touched her inappropriately on more than one occasion. She described a "poking" game that Defendant played with her, and explained that Defendant would touch her under her underwear and on the breasts. Her mother was notified and filed a report with law enforcement that same day. On November 11, 2016, Faith Benton, a forensic interviewer with the Children's Advocacy Center (CAC) interviewed K.R.W. During the interview, K.R.W. described the same events that she reported to her school counselor.

---

[1]The initials of the victim are used in accordance with La.R.S. 46:1844(W).

Defendant was arrested, and provided two statements to law enforcement on November 14, and 18, 2016. In the first statement, Defendant denies, completely, ever touching K.R.W. inappropriately. In his second statement, Defendant again denies touching K.R.W. inappropriately, but also states that maybe he did touch K.R.W. while he was tickling her, but without noticing.

At trial, both the school counselor and Ms. Benton testified, and the CAC interview was admitted into evidence. K.R.W. also testified and showed the jury on a picture where Defendant touched her. She further testified that she told the CAC interviewer, Ms. Benton, the truth.

Defendant's son, Braxton Jinks; godson, Dedryck Leday; sister, Jimmie Jinks; and Annabelle Benoit, who lived with Defendant and the victim, testified that they never witnessed anything inappropriate between Defendant and K.R.W., but that they were not home one hundred percent of the time.

The jury returned a verdict of guilty. The sentencing hearing was set for July 7, 2018. Defendant filed a Motion for New Trial, which was set for June 12, 2018. On June 12, 2018, the hearing dates for the Motion for New Trial, as well as sentencing were upset, and both rescheduled for June 19, 2018. On that date, the trial court denied Defendant's Motion for New Trial and sentenced Defendant to the statutory minimum of twenty-five years at hard labor without the benefit of parole, probation, or suspension of sentence, with credit for time served.

On appeal, Defendant asserts three assignments of error:

> (1) The [trial] court erred in proceeding with sentencing without receiving a waiver or waiting for the statutory delay after denial of the motion [for] new trial.

> (2) The trial court erred in denying [Defendant] his right to present a defense and to impeach the State's witness with relevant evidence of her credibility and prior false accusations.

2

(3) The non-unanimous verdict does not support a felony conviction or satisfy due process; a new trial should be granted.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent that has been assigned as error in Defendant's Assignment of Error Number One and will be discussed in that section, one error patent that will be discussed in the error patent section, and one error in the Uniform Commitment Order that needs correction.[2]

First, La.R.S. 14:89.1(D)(1) mandates that the trial court, "after determining the financial resources and future ability of the offender to pay, require the offender, if able, to pay the victim's reasonable cost of counseling" resulting from the offense. The trial court failed to make this determination at the sentencing proceeding; thus, the sentence is illegally lenient. *See State v. P.T.*, 07-665, p. 2

---

[2] We note that, although it does not rise to the level of an error patent, there is one issue worth noting. Defendant was sentenced under the increased penalty provision for aggravated crime against nature even though Defendant was not specifically charged under the increased penalty provision, and the jury made no factual finding as to the increased penalty provision. La.R.S. 14:89.1(C)(2). Although the bill of information did not specifically state that Defendant was being charged with "the under thirteen" provision, the bill did set forth the victim's birthdate (9/12/05). Thus, according to the bill of information, the victim was eleven on the date the offense was committed (11/7/16). Although the jury did not make a specific finding as to the victim's age, the trial court stated at sentencing that the victim was eleven when the offense was committed. No one objected, and no error has been raised on appeal. In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63 (2000), the United States Supreme Court determined that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Since no such factual determination was made by the jury in the present case, it is arguable that an *Apprendi* violation occurred in this case. This court, however, does not typically recognize *Apprendi* violations as an error patent. *See also State v. Kelly*, 15-484 (La. 6/29/16), 195 So.3d 449, 457, where the supreme court chastised this court for going beyond the face of the record to decipher and explain the court's sentence. Additionally, when addressing an assigned error, this court has applied a harmless error analysis to an *Apprendi* violation. *State v. Ardoin*, 10-1018, pp. 31-33 (La.App. 3 Cir. 3/9/11), 58 So.3d 1025, 1044-45, *writ denied*, 11-653 (La. 10/14/11), 74 So.3d 218. If a harmless error analysis may be applied to a raised error regarding *Apprendi*, it stands to reason that this court would not recognize an error patent when no one objected to the trial court's application of the increased penalty provision and no such error has been assigned on appeal. Thus, no error patent has been recognized in the present case.

(La.App. 3 Cir. 12/5/07), 970 So.2d 1255, 1257, *writ denied*, 08-26 (La. 5/30/08), 983 So.2d 895. Although the authority is granted under La.Code Crim. P. art. 882 for this court to correct an illegal sentence on appeal, this court will not consider an illegally lenient sentence unless it is raised as an error. *State v. Aguillard*, 17-798 (La.App. 3 Cir. 4/11/18), 242 So.3d 765; *State v. Celestine*, 11-1403 (La.App. 3 Cir. 5/30/12), 91 So.3d 573; and *State v. Jacobs*, 08-1068 (La.App. 3 Cir. 3/4/09), 6 So.3d 315, *writ denied*, 09-755 (La. 12/18/09), 23 So.3d 931.

Second, the Uniform Commitment Order needs correction. At sentencing, the trial court ordered that Defendant's sentence be served without the benefit of parole, probation, or suspension of sentence. Although the minutes of sentencing correctly reflect that the sentence is to be served without benefits, the Uniform Commitment Order does not. Thus, this court remands and orders that the Uniform Commitment Order be corrected to accurately reflect the trial court's imposition of the sentence without the benefit of parole, probation, or suspension of sentence.

**SENTENCING WITHOUT DELAY:**

In his first assignment of error, Defendant argues that the trial court erred in proceeding with sentencing without receiving a waiver of delay or waiting for the statutory delay after its denial of Defendant's Motion for New Trial. Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

4

The Louisiana Supreme Court addressed Defendant's argument in *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied,* __ U.S. __, 138 S.Ct. 1175 (2018) and held that the sentencing delay may not be implicitly waived, however, the trial court's error in failing to observe the mandatory delay may be harmless.

The *Kisack* trial court imposed the maximum sentence of life imprisonment after finding the defendant guilty of possessing a contraband cell phone in the Orleans Parish Prison and adjudicating him a fourth felony offender. At the hearing of a motion for new trial, the trial court denied the motion and immediately proceeded with sentencing the defendant. The fourth circuit court of appeal found that the defense counsel's participation and argument at the sentencing hearing implicitly waived the statutory delay. The supreme court, however, vacated the habitual offender adjudication that immediately followed the trial court's failure to observe the statutory sentencing delay and remanded the matter to the trial court.

The supreme court held that "[a]n implicit waiver . . . runs afoul of the plain language of [La.Code Crim.P.] Art. 873 that requires that the waiver be expressly made." *Id.* at 1205. Nevertheless, it also found that a trial court's failure to observe the statutory sentencing delay "may still be found harmless." *Id.* at 1206.

The trial court's failure to observe the statutory sentencing delay in this case was such a harmless error. Defense counsel and the State agreed on June 12, 2018, to reschedule and hold the sentencing hearing on the same date that Defendant's Motion for New Trial was being argued, June 19, 2018. Defendant was found guilty and was subject to a sentencing range of twenty-five to ninety-nine years at hard labor. La.R.S. 14:89.1(C)(2). Thus, he had to be sentenced to at least twenty-five years in prison, whether sentenced immediately after the denial of the motion

5

or more than twenty-four hours after that denial. Defendant did not file a motion to reconsider his sentence.

Defendant argues that the delay would have permitted his counsel to file a motion for downward departure or to otherwise ready Defendant for sentencing. Defendant cites *State v Williams*, 96-37 (La.App. 3 Cir. 6/26/96), 677 So.2d 692, in support of his argument for remand. In *Williams*, this court did vacate the defendant's sentence and remand for resentencing, however, this court also explained that "[s]ince defendant challenges the sentence on appeal, this error is not harmless." *Id*. at 699.

Defendant in this case has not challenged his sentence on appeal. He also received the statutory minimum sentence. Therefore, he suffered no prejudice as a result of the failure to observe the sentencing delay. *See State v. Moffett*, 17-769 (La.App. 4 Cir. 6/13/18), 247 So.3d 908 (finding harmless error where the sentence was imposed less than twenty-four hours after the denial of defense's motion for new trial, but two months after the defendant's conviction, the court was supplied with a letter of mitigation by the defense, and the sentence was half of the maximum sentence); *State v. Bell*, 13-1443 (La.App. 3 Cir. 6/4/14), 140 So.3d 830 (finding harmless error where the defendant made no objection to proceeding with sentencing, did not file a motion to reconsider sentence, and did not assign the excessiveness of his sentence as error on appeal); *State v. Bell*, 11-720, p. 8 (La.App. 3 Cir. 1/9/13), 106 So.3d 295, 301, *writ denied*, 13-347 (La. 11/1/13), 124 So.3d 1106 (finding harmless error where the defendant did "not assign as error excessiveness of his sentence, and he [did] not show, or even alleged, any way he was prejudiced by the lack of delay.").

6

While Defendant correctly asserts that the trial court erred in proceeding with sentencing immediately after denying his Motion for New Trial, we find that the error was harmless. This assignment of error has no merit.

**RIGHT TO PRESENT A DEFENSE:**

In his second assignment of error, Defendant contends that the trial court erred in denying Defendant his right to present a defense and to impeach the victim, K.R.W., with relevant evidence of her credibility and prior false accusations. Specifically, Defendant intended to introduce the testimony of his sister, Jimmie Jane Jinks, that K.R.W. had alleged to her mother on two prior occasions that she was touched inappropriately by two different boys. The trial court refused to allow Defendant to present this testimony to the jury, but it was proffered.

"A trial judge's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion." *State v. Thompson*, 15-1518, p. 6 (La.App. 1 Cir. 4/15/16) (unpublished opinion), *writ denied,* 16-762 (La. 4/13/17), 216 So.3d 793.

Defendant's counsel asked Ms. Jinks if she ever had an opportunity "to hear anything in regard to [the victim]'s assertion that someone else had touched her inappropriately[.]" Ms. Jinks answered, "Yes, sir[,]" and the State's counsel objected on grounds of lack of foundation, relevancy, and hearsay. After the jury was excused, defense counsel proffered Ms. Jink's testimony.

Ms. Jinks testified that she heard the victim say, "some little boy on the – on the school bus touched her." When K.R.W.'s mother "looked into it, it wasn't that someone touched her on the bus. It was because the little boys were picking on her cause [sic] she stunk [sic]." K.R.W. "decided to use that as an excuse to get out of

7

school." Ms. Jinks did not testify regarding how she came to know this information. Another purported incident involved a little boy who lived down the street. Ms. Jinks testified that K.R.W. "come [sic] running back to her mom and told her mom that the little boy had touched her." The victim's mother spoke to Coby's parents and learned "it was also a lie." Ms. Jinks also did not testify regarding how she learned the accusation was a lie. Ms. Jinks said both incidents happened when the victim was around ten or eleven years old, within three years of the trial.

Although Ms. Jinks testified that she heard the victim make these accusations, Defense counsel agreed testimony regarding anything that happened after "may be hearsay." However, he argued that this testimony regarding the victim's truthfulness is Defendant's only defense.

The trial judge found that Defendant had provided an insufficient foundation for Ms. Jinks's testimony. She commented that Ms. Jinks "doesn't know when it happened. She doesn't have any details other than [the victim] said this. It seems suspicious to the Court that [Ms. Jinks] would testify to this today with the limited information that she provided – the conclusory nature of her testimony." Therefore, the trial court disallowed the testimony.

"Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of [a] crime as provided in Articles 609 and 609.1 or as constitutionally required." La.Code Evid. art. 608(B). Further, "in all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation

8

only." La.Code Evid. art. 405(A). Ms. Jinks's proffered testimony constitutes the type of evidence prohibited by these articles.

The first circuit court of appeal addressed this issue in *State v. Thompson*, 15-1518 (La.App. 1 Cir. 4/15/16) (unpublished opinion), and affirmed the trial court's exclusion of the testimony. The defendant alleged that the trial court improperly excluded testimony that the victim previously made threats to falsely tell police that three men sexually assaulted her. Therefore, the defendant argued that the trial court hindered his right to present a defense to charges of aggravated incest and sexual battery.

Citing *State v. Smith,* 98-2045, p. 7 (La. 9/8/99), 743 So.2d 199, 203-04 the first circuit noted:

> When a defendant seeks to introduce evidence that the victim has made such prior false accusations, the trial judge must evaluate that evidence by determining whether reasonable jurors could find, based on the evidence presented by defendant, that the victim had made prior false accusations and whether all other requirements of the Code of Evidence have been satisfied.
>
> Thus, two requirements must exist before evidence of prior false accusations of sexual misconduct can be considered as impeachment evidence. First, the activity must be of a sexual nature. Second, there must be evidence that the statement is false. Assuming this initial burden is met, all other standards for the admissibility of evidence apply.

*Thompson*, 98-2045 at p. 6 (citations omitted). The *Thompson* victim testified that she had not threatened to accuse the men. A witness testified outside of the jury's presence that the victim had come to her house to use the telephone after a disagreement with family members. The witness said that the victim threatened to report the men for sexually abusing her. She did not state whether she believed the victim's accusation to be true. The trial court excluded the testimony on the

9

grounds that the risk of unfair prejudice substantially outweighed the probative value on the issue of the victim's credibility.

On appeal, the first circuit found:

[H]ad the trial court made its evidentiary ruling under *Smith,* the only evidence it had to consider was: (1) T.M.'s own statement that she made no such allegations of sexual abuse; and (2) Ms. Warren's statement that T.M. made such a statement, but with no corroborating evidence of whether such a statement was false or not. Therefore, unlike *Smith,* a reasonable jury could not have found from the evidence adduced at the midtrial hearing that the victim made a prior false accusation.

*Thompson*, 98-2045 at p. 7. The first circuit agreed with the trial court that the prejudicial effect of the testimony greatly outweighed any probative value of the evidence.

In *State v. Williams*, 17-544 (La.App. 4 Cir. 3/14/18), 240 So.3d 355, the fourth circuit court of appeal also upheld the trial court's exclusion of testimony regarding a prior specific act of the victim evidencing her untruthfulness. The defendant contended that the victim claimed, "her aunt had beaten her with a stick following an incident at school." *Id*. at 367. An Office of Child Services (OCS) investigation ensued. The victim later admitted that she lied because she no longer wanted to live with her aunt. The defendant argued that the State's motion in limine to exclude evidence of the accusation and the investigation should be denied because it showed the victim's motivation for lying and her tendency to lash out after being disciplined. He also argued that evidence of the incident undermined the victim's credibility, and that he had a right to present that as a defense. The trial court granted the State's motion and prohibited the defendant from addressing the OCS investigation and the victim's untruthfulness.

The fourth circuit noted:

The Louisiana Supreme Court opined that "relevancy and admissibility are discretion calls for the trial judge," which "should not be overturned absent a clear abuse of discretion." *State v. Mosby*, 595 So.2d 1135, 1139 (La.1992). Also,

> Although La. C.E. art. 607(C) permits a party to attack the credibility of a witness by examining him concerning any matter having a reasonable tendency to disprove the truthfulness of his testimony, this grant is necessarily subject to the relevancy balance of La. C.E. art. 403 and to the limitation set forth in La. C.E. art. 608(B), generally precluding inquiry into particular acts, vices or courses of conduct to attack character for truthfulness.

*State v. Tauzin*, 38,436, p. 12 (La. App. 2 Cir. 8/18/04), 880 So.2d 157, 164; *State v. Meshell,* 567 So.2d 1181 (La. App. 3d Cir.1990).

*Williams*, 240 So.3d at 367. Because the defendant sought to introduce a particular act of the victim which showed her untruthfulness "instead of her general reputation with regard to truthfulness or untruthfulness[,]" the fourth circuit found that the trial court correctly disallowed evidence of the OCS investigation and "the untruths told by [the victim] to OCS regarding her aunt." *Id.*

In the current case, Defendant did not offer evidence of the victim's general reputation in the community. Rather, he attempted to disprove her credibility and attack her character for truthfulness with evidence of her alleged untruthfulness in two specific incidences from a witness who only had firsthand knowledge that the victim made the accusations, not of the truthfulness of those accusations.

As in *Thompson*, Defendant was not completely precluded from attacking K.R.W.'s credibility. He could have asked her if anyone else had ever behaved inappropriately with her. He was free to offer admissible evidence of K.R.W.'s reputation for truthfulness, assuming any existed. However, he never attempted to present any evidence of that kind other than the proffered testimony of Ms. Jinks.

Defendant argues that Ms. Jinks's testimony was important because his defense was based on the unreliability of K.R.W.'s testimony, which was the only evidence against him. Yet, he did not argue insufficiency of the evidence on appeal. Ms. Jinks only testified that K.R.W. accused two boys of touching her, without any details about how the boys touched her, or any firsthand knowledge regarding whether these accusations were true or false. Defendant did not present any testimony regarding K.R.W.'s general reputation for untruthfulness. Thus, we find that the trial court did not err in excluding Ms. Jinks's testimony, and that this assignment of error lacks merit.

**NON-UNANIMOUS VERDICT:**

Lastly, in his third assignment of error, Defendant argues that the non-unanimous verdict does not support a felony conviction or satisfy due process, and he should, therefore, receive a new trial. Louisiana Code of Criminal Procedure Article 782(A) provides that a defendant charged in a case "in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." This language reflects the provisions of La.Const. art. 1, §17.

The Louisiana Supreme Court has held that La.Code Crim.P. art. 782(A) does not violate the Fifth, Sixth, and Fourteenth Amendments of the federal Constitution. *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738. Recently, in the November 6, 2018 election, Louisiana voters opted to change the constitutional provision and require unanimous verdicts, which states:

> A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

12

Therefore, the amendment to La.Const. art. 1, §17 only applies to those offenses committed on, or after January 1, 2019. Defendant's offense occurred prior to January 1, 2019. Thus, the constitutional amendment does not apply to him and Defendant's third assignment of error lacks merit.

**DECREE:**

Defendant's conviction and sentence are affirmed. However, the Uniform Commitment Order is ordered to be corrected to accurately reflect the trial court's order that the sentence be served without the benefit of parole, probation, or suspension of sentence.

**CONVICTION AND SENTENCE AFFIRMED; UNIFORM COMMITMENT ORDER REMANDED FOR CORRECTION.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-733

**STATE OF LOUISIANA**

**VERSUS**

**ELVIN BRYANT JINKS, JR.**

**Cooks, J., dissents.**

Elvin Bryant Jinks, Jr. (Defendant) was charged by bill of information with a violation of La.R.S. 14;89.1, aggravated crime against nature. He was convicted of one count of aggravated crime against nature perpetrated on his eleven-year-old stepdaughter. The only evidence presented by the State was the victim's testimony. There is no medical evidence, no physical evidence, or any other corroborating evidence. He was convicted by a ten-two jury verdict and sentenced to the statutory minimum of 25 years without benefit. I respectfully dissent from the majority's affirmance of Defendant's sentence and conviction. I believe there are four significant legal errors in this case which mandate a new trial or at the very least re-sentencing. Two errors are patent which I elect to discuss first.

*Apprendi violation, error patent.*

Defendant was sentenced pursuant to the enhancement provision provided in La.R.S. 14:89.1(C)(2), despite the fact that the charging bill of information did not reference the provision and no amendment to the bill of information occurred prior to trial. The majority notes that the bill of information states the victim's date of birth from which one can deduce that she was eleven years old at the time of the offense. The bill of information sets forth the date of the offense as "on or about November 7, 2016," and sets forth K.A.'s date of birth as "09/12/05." But the Bill of Information does not explicitly or implicitly charge Defendant under the

1

provisions of La.R.S. 14:89.1 (C)(2). The majority also notes *the jury did not make a determination as to the victim's age*, but, it says, the trial court stated at sentencing that the victim was eleven at the time the offense occurred. The majority further notes Defendant did not object at trial and has not raised this issue on appeal. The majority states this is "arguably" an *Apprendi*[1] violation but maintains this court does not "typically recognize *Apprendi* violations as an error patent." It further reasons that because this court applies the harmless error rule to *Apprendi* violations when such are raised on appeal then "it stands to reason that this court would not recognize an error patent when no one objected to the trial court's application of the increased penalty provision and no such error has been assigned on appeal." Accordingly, the majority concludes we should not address this error patent because it was harmless error. I believe the latter argument is circuitous. *This presents an error patent on the face of the record which we are duty bound to review in light of Apprendi and its progeny and our law regarding errors patent.* Louisiana Code of Criminal Procedure Article 920 *mandates review of errors patent* which are defined as: "An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

> Any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi, supra; Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *see also State v. Gibson, supra,* for a thorough discussion of *Apprendi* and its progeny.
>
> **The state must explicitly note in the bill of information that the enhanced sentence provision is applicable to a defendant,** and the trial court must include a jury instruction reflecting the ages of the victim and defendant. *State v. Gibson, supra.*

*State v. Robinson*, 49,821, p. 12 (La.App. 2 Cir. 5/20/15), 166 So.3d 395, 402, *writ denied*, 15-1400 (La.9/16/16), 206 So.3d 201. See also *State v. Johnson*, 11-1213

---

[1]    *Apprendi v. New Jersey*, 530 US 466, 120 S.Ct. 2348 (2000).

(La.App. 4 Cir. 2/7/13), 109 So.3d 994, *writ denied*, 13-0554 (La.11/1/13), 124 So.3d 1106.

It is apparent on the face of the record that the Bill of Information does not include any explicit, or even an implicit, reference to the enhanced sentence provision. The Bill of Information in this case reads as follows:

IN THE THIRTY-EIGHTH JUDICIAL DISTRICT COURT

for the

PARISH OF CAMERON [,]
STATE OF LOUISIANA[.]
JENNIFER A. JONES, District Attorney in and for the Thirty-Eighth Judicial District Court, and by authority of the Laws of the STATE OF LOUISIANA charges that on or about November 7, 2016, at and in the parish , District and State aforesaid

ELVIN BRYANT JINKS, JR.

Committed the offense of[:]

R.S.14:89.1
AGGRAVATED CRIME AGANST NATURE

In that HE

COUNT I: committed the offense of AGGRAVATED CRIME AGAINST NATURE by the unnatural carnal copulation by a human being, with another by the use of the genital organs and is committed under one of the following circumstances: ELVIN BRYANT JINKS, JR. did touch his step-daughter, KRW, W/F DOB-09/12/05, under her clothing on her bare vagina and breasts with his bare hand.

Contrary to the laws of the State of Louisiana and against the Peace and Dignity of the same.

It is also apparent on the face of this record that the jury verdict sheet states only that "we the Jury find the Defendant Guilty of Aggravated Crimes against Nature." That verdict may well refer to a violation of La.R.S. 18:89.1(A)(2) which would subject Defendant to a fine of not more than fifty thousand dollars or imprisonment with or without hard labor for not less than five nor more than twenty years or both as provided in La.R.S. (C)(1). But Defendant was sentenced under the

3

provisions of La.R.S. 18:89.1(C)(2) which requires, when the victim is under the age of thirteen and the offender is seventeen or older imposition of a mandatory minimum sentence of twenty-five years at hard labor up to ninety-nine years with at least twenty-five years "without benefit of parole, probation, or suspension of sentence." The jury verdict form gives no indication that it found Defendant guilty of an aggravated crime against nature when the victim is under thirteen and the perpetrator is over seventeen years of age, nevertheless, the judge, when sentencing Defendant first remarked:

> Mr. Jinks, you have been found guilty of Aggravated Crime Against nature, a violation of the Louisiana Revised Statute 14:89.1(C)(2), by a jury of your peers. Upon conviction of Aggravated Crime Against Nature, when the victim is under the age of thirteen years and the offender is seventeen years of age or older, the offender shall be punished by imprisonment at hard labor for not less than 25 years nor more than 99 years. At least 25 years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.
>
> ***I find*** *that the victim in this matter was a stepchild of the defendant who was 11 years old at the time of the crime.* I find the mitigating factors applicable to this case are that the defendant does not have any prior felony convictions. He is presently 50 years old.

The transcript of the record includes the jury instructions. The trial court informed the jury as follows:

> In this—in the case, at trial, before you, the defendant is charged by a bill of information. The bill of information is only an accusation of the alleged crime and is not to be considered as evidence of any guilt of the defendant. It merely—it is merely part of the process by which he is brought to the court for the determination of guilt or innocence.
>
> Docket Number 158217 reads in pertinent part that the district attorney charged that on or about November 7, 2016, that Elvin Bryant Jinks, Jr., committed the offense of Aggravated Crime Against Nature by touching his stepdaughter, KRW, a white female, with a date of birth of September 12, 2005, under her clothing, on her bare vagina and breasts, with his bare hand.
>
> Aggravated Crime Against Nature is the engaging in any prohibited act with a person who is under 18 years of age and who is known to the offender, to be related to the offender, as any of the following: biological, step, or adoptive relatives, child, grandchild of

4

any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew or niece. The prohibitive acts are Sexual battery, indecent Behavior with a Juvenile, Molestation of a Juvenile, or any other involvement of a child in sexual activity constituting a crime under the laws of this state . . .

. . . .

Lewd and lascivious encompasses not only the physical touching of the victim in an indecent manner, but also indecent sexual displays in the presence of children under the age of 17. . .

Sexual Battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender directly or through clothing or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim directly or through clothing when any of the following occurred: one, the offender acts without the consent of the victim; and two, the victim has not yet attained 15 years of age and is—and is at least three years younger than the offender.

. . . .

Indecent Behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person. Any lewd or lascivious act upon the person or in the presence of any child under the age of 17 where there is a[n] sic age difference of greater than two years between the two persons.

Molestation of a Juvenile is the commission by anyone over the age of 17 of any lewd and lascivious act upon the person or in the presence of any child under the age of 17 where there is an age difference of greater than two years between the two persons. . .

. . . .

I will now review the necessary elements on each charge. In order to convict the defendant of Aggravated Crime Against Nature, you must find: one, that defendant Elvin Bryant Jinks, Jr., is the stepfather of the victim and this fact was known by Elvin Bryant Jinks; and two, that defendant Elvin Bryant Jinks, was over the age of 17 at the time of the offense; and three, that the defendant, Elvin Bryant Jinks, Jr., engaged in one of the following prohibited acts: A, Sexual battery; or B, Indecent Behavior with a Juvenile; or C, Molestation of a Juvenile; or D, Lewd fondling or touching; and four, that Elvin Bryant Jinks, Jr., did so with the intention of arousing or gratifying his sexual desires or those of the victim; and five, that the victim, at the time, was under 13 years of age; and six, that the offense occurred in Cameron parish, Louisiana, on or about the date given.

The trial court then explained general and specific criminal intent and the meaning of an attempt to commit a crime. After giving these instructions the trial court continued:

> I will now instruct you as to the verdicts which you may render in this case. As to Aggravated Crime Against Nature, you may render any one, but only one, of the following verdicts: A, guilty of Aggravated Crime Against Nature; B, guilty of Attempted Aggravated Crime Against Nature; C, guilt y of Sexual battery; D, guilty of Attempted Sexual battery; E, guilty of Attemptted Indecent Behavior with a Juvenile; G; guilty of Molestation of a Juvenile; H, guilty of Attempted Molestation of a Juvenile; I, not guilty.
>
> Thus, if you are convinced beyond a reasonable doubt that the defendant is guilty of Aggravated Crime Against Nature, then the form of your verdict should be guilty of Aggravated Crime Against Nature.
>
> . . . .
>
> Ten out of twelve of you must agree upon any verdict that is rendered in the case. And until at least ten of you do concur in a verdict, the Court cannot accept a verdict from you.

The court then instructed the jury on their duty to consult with each other and consider each other's views.

Louisiana Revised Statute 14:89.1(A)(1)(f) defines aggravated crime against nature as "an act as defined by R.S. 14:89(A)(1) committed under any one or more of the following circumstances: (f) When the victim is under the age of seventeen years and the offender is at least three years older that the victim." The act provides in La.R.S. 14:89.1(B) that: "Whoever commits the crime of aggravated crime against nature as defined by Paragraph (A)(1) of this Section shall be imprisoned at hard labor for not less than three nor more than fifteen years, such prison sentence to be without benefit of suspension of sentence, probation or parole." The Act further provides in La.R.S. 14:89.1(A)(2)a:

> The engaging in any prohibited act enumerated in Subparagraph (b) of this Paragraph with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of

6

any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

The penalty for this offense is set forth in La.R.S. 14:89.1(C)(1) which provides:

> Whoever commits the crime of aggravated crime against nature as defined by Paragraph (A)(2) of this Section shall be fined an amount not to exceed fifty thousand dollars, or imprisoned, with or without hard labor, for a term not less than five years nor more than twenty years, or both.

Defendant was sentenced under the enhanced penalty provision found in La.R.S. 14:89.1(C)(2) which states:

> Whoever commits the crime of aggravated crime against nature as defined by Paragraph (A)(2) of this Section with a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

In *Apprendi* the U.S. Supreme Court held:

> Our answer to [this] question was foreshadowed by our opinion in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime ***must be charged in an indictment***, *submitted to a jury, and proven beyond a reasonable doubt." Id.,* at 243, n. 6, 119 S.Ct. 1215. The Fourteenth Amendment commands the same answer in this case involving a state statute.

*Apprendi*, 530 U.S. at 476 (emphasis added).

> At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); see also *Sullivan v. Louisiana,* 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Winship,* 397 U.S., at 364, 90 S.Ct. 1068 ("[T]he Due Process

Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

As we have, unanimously, explained, *Gaudin,* 515 U.S., at 510-511, 115 S.Ct. 2310, the historical foundation for our recognition of these principles extends down centuries into the common law. "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours...." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added). See also *Duncan v. Louisiana,* 391 U.S. 145, 151-154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. "The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence § 321, pp. 681-682 (1954); see also 9 J. Wigmore, Evidence § 2497 (3d ed.1940)." *Winship,* 397 U.S., at 361, 90 S.Ct. 1068. We went on to explain that the reliance on the "reasonable doubt" standard among common-law jurisdictions " 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' " *Id.,* at 361-362, 90 S.Ct. 1068 (quoting *Duncan,* 391 U.S., at 155, 88 S.Ct. 1444).

Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after **being initiated by an indictment containing "all the facts and circumstances which constitute the offence, ... stated with such certainty and precision, that the defendant ... may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly ...** and *that there may be no doubt as to the judgment which should be given,* if the defendant be convicted." J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862) (emphasis added). **The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime.** See 4 Blackstone 369-370 (after verdict, and barring a defect in the indictment, pardon, or

benefit of clergy, "the court *must pronounce that judgment, which the law hath annexed to the crime* " (emphasis added)).

Thus, with respect to the criminal law of felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing. The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense. The judge was meant simply to impose that sentence (unless he thought in the circumstances that the sentence was so inappropriate that he should invoke the pardon process to commute it)." Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700-1900, pp. 36-37 (A. Schioppa ed.1987). As Blackstone, among many others, has made clear, "[t]he judgment, though pronounced or awarded by the judges, is not their determination or sentence, but the determination and sentence of the law." 3 Blackstone 396 (emphasis deleted).

This practice at common law held true when indictments were issued pursuant to statute. Just as the circumstances of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment. "**Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offence, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have been committed under those circumstances, and must state the circumstances with certainty and precision**. [2 M. Hale, Pleas of the Crown]." Archbold, Pleading and Evidence in Criminal Cases, at 51. If, then, "upon an indictment under the statute, the prosecutor prove the felony to have been committed, but fail in proving it to have been committed under the circumstances specified in the statute, the defendant shall be convicted of the common-law felony only." *Id.,* at 188.

*Apprendi v. New Jersey*, 530 U.S. at 476–81.

The trial judge at sentencing *said she finds the elements of the enhanced offense* under La.R.S. 14:89.1(C)(2) were met and then imposes sentence under the enhanced provision. In so doing, I believe she did what only the jury was empowered to do. Given the charge in the bill of information and the jury's verdict as indicated on the jury form, the verdict indicates the jury, at most, found Defendant guilty of a violation of 14:89.1 (A)2*a*, thus, the judge was bound to impose sentence only under the provisions of La.R.S.( C) (1). The United States Supreme Court in *Apprendi* attempted to give some clarity to the issue:

9

The foregoing notwithstanding, however, the New Jersey Supreme Court correctly recognized that it does not matter whether the required finding is characterized as one of intent or of motive, because "[l]abels do not afford an acceptable answer." 159 N.J., at 20, 731 A.2d, at 492. That point applies as well to the constitutionally novel and elusive distinction between "elements" and "sentencing factors." *McMillan,* 477 U.S., at 86, 106 S.Ct. 2411 (noting that the sentencing factor-visible possession of a firearm-"might well have been included as an element of the enumerated offenses"). Despite what appears to us the clear "elemental" nature of the factor here, *the relevant inquiry is one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?*

As the New Jersey Supreme Court itself understood in rejecting the argument that the required "motive" finding was simply a "traditional" sentencing factor, proof of motive did not ordinarily "increase the penal consequences to an actor." 159 N.J., at 20, 731 A.2d, at 492. Indeed, the effect of New Jersey's sentencing "enhancement" here is unquestionably to turn a second-degree offense into a first-degree offense, under the State's own criminal code. The law thus runs directly into our warning in Mullaney that Winship is concerned as much with the category of substantive offense as "with the degree of criminal culpability" assessed. 421 U.S., at 698, 95 S.Ct. 1881. This concern flows not only from the historical pedigree of the jury and burden rights, but also from the powerful interests those rights serve. The degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.

The preceding discussion should make clear why the State's reliance on *McMillan* is likewise misplaced. The differential in sentence between what Apprendi would have received without the finding of biased purpose and what he could receive with it is not, it is true, as extreme as the difference between a small fine and mandatory life imprisonment. *Mullaney,* 421 U.S., at 700, 95 S.Ct. 1881. But it can hardly be said that the potential doubling of one's sentence-from 10 years to 20-has no more than a nominal effect. Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here is unquestionably of constitutional significance. *When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense." McMillan,* 477 U.S., at 88, 106 S.Ct. 2411.

New Jersey would also point to the fact that the State did not, in placing the required biased purpose finding in a sentencing enhancement provision, create a "separate offense calling for a separate penalty." *Ibid.* As for this, we agree wholeheartedly with the New

Jersey Supreme Court that merely because the state legislature placed its hate crime sentence "enhancer" "within the sentencing provisions" of the criminal code "does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense." 159 N.J., at 20, 731 A.2d, at 492. Indeed, the fact that New Jersey, along with numerous other States, has also made precisely the same conduct the subject of an independent substantive offense makes it clear that the mere presence of this "enhancement" in a sentencing statute does not define its character.

*Apprendi*, 530 U.S. at 494–96 (emphasis added).

These failures do not result in overturning Defendant's conviction. Under the harmless error analysis explained by this court in *State v. Ardoin*, 10-1018 (La. App.3 Cir. 3/9/11), 58 So.3d 1025, *writ denied*, 11-0653 (La.10/14/11), 74 So3d 218, and the cases cited therein, the jury in this case could have found the essential elements to convict Defendant of aggravated crime against nature as charged in the bill of information. The problem here, however, is with the judge's sentencing. As explained by our sister circuit in *State v. Johnson*, 11-1213, p. 9-10, (La.App. 4 Cir. 2/7/13), 109 So.3d 994, 1000, *writ denied,* 13-0554 (La.11/1/13), 124 So.3d 1106 (emphasis added):

> In *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court clarified its previous holdings in *Ring* [*v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)] and *Apprendi.* In *Blakely,* the petitioner pleaded guilty to kidnapping. The facts admitted in the petitioner's guilty plea supported a maximum sentence of fifty-three months; however, pursuant to state law, the trial court imposed an "exceptional" sentence of ninety months after making a judicial determination that the defendant acted with "deliberate cruelty." *Id.,* 542 U.S. at 300–02, 124 S.Ct. 2531. The Supreme Court considered the holdings in *Apprendi* and *Ring,* **recognizing that the facts supporting the sentence enhancement were neither admitted by the defendant nor found by a jury. The Court ultimately concluded that "the relevant 'statutory maximum' [for the purposes of** *Apprendi* **] is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose** *without* **any additional findings.**" *Id.,* 542 U.S. at 303–04, 124 S.Ct. 2531 (emphasis in the original).
>
> After considering the holdings of *Apprendi*, *Ring,* and *Blakely,* we conclude that trial court committed

an *Apprendi* violation in this case. The relevant "statutory maximum" for a violation of La. R.S. 14:43.1 is ten years imprisonment with or without hard labor; this is the maximum sentence the trial court could have imposed without any additional findings. In order to sentence the defendant pursuant to the enhanced sentencing provision of La. R.S. 14:43.1 C(2), a finder of fact must determine that the defendant was seventeen years of age or older and that the victim was under the age of thirteen. The jury instructions did not reflect that the victim's and the defendant's ages are elements of the enhanced sentencing provision of La. R.S. 14:43.1 C(2).

**The state should have explicitly noted in the bill of information that La. R.S. 14:43.1 C(2) was applicable to the defendant** given that sexual battery is a lesser included offense of aggravated rape. Moreover, the trial judge should have included a jury instruction reflecting that the defendant's and the victim's ages were elements of the enhanced sentencing provision.

For the reasons set forth above I believe the judge's sentence cannot stand. Defendant must be re-sentenced under the provisions of L.R.S. 14:89.1 for which he received due notice in the bill of information, and which can be concomitantly applied under the jury verdict of "guilty of aggravated crimes against nature." But I hasten to add that I have even *more serious concerns* with this conviction.

*Sentencing without delay, error patent*.

The majority rejects Defendant's assertion that the trial court erred by proceeding with sentencing without the required twenty-four-hour delay after denial of his motion for new trial. *The majority acknowledges that the state supreme court has ruled that this delay may not be implicitly waived but must be explicitly waived on the record.* Nevertheless, it finds the error was harmless because Defendant received the mandatory minimum sentence. I do not believe the jurisprudence supports that conclusion. Defendant argues the error is not harmless because the delay would have permitted his attorney to file a motion for downward departure. The majority also bases its decision on the notion that "Defendant in this case has not challenged his sentence on appeal." I disagree. In his brief to this court Defendant plainly states at the close of his argument on this assignment of error: "As

12

per [*State v.*] *Williams* [96-37 (La.App. 3 Cir. / /96) 677 So.2d 692] the sentence is null and does not support incarceration. The case must be remanded for re-sentencing." I believe Defendant has clearly challenged his sentence asserting his sentence is null and void and must be re-done. Just because he did not attack the number of years does not mean he has failed to attack his sentence. I agree with Defendant's argument, especially in this case where he had no prior offenses.

On June 12, 2018, the trial court held a brief hearing. District Attorney Jennifer Jones, Assistant District Attorney W. Thomas Barrett, III (Barrett) and defense counsel Robert J. Sheffield, Jr. (Sheffield) were present. Defendant was not present. Barrett asked the court to upset the date fixed for Defendant's motion for new trial and sentencing. He represented to the court that the re-fixing of the hearing date for the motion for new trial was "by agreement with defense counsel." Barrett then added the State wanted to upset the sentencing date scheduled for July 7, 2018 to also be scheduled for June 19, 2018. The trial court said "so ordered" and the matter concluded. *Defendant was not present to make an express waiver of the statutory delays for sentencing and the transcript does not indicate that his attorney made any indication that Defendant was expressly waiving his right to delays for sentencing.* The court minutes do not reflect any express waiver of Defendant's right to delay sentencing. Defense counsel did not object to the fixing, but our courts have held that such failure does not comply with the statutory requirement of an express waiver. *See State v. Kelly*, 375 So. 2d 1344 (La. 1979).[2] In *State v. Augustine*, 555

---

[2] … the record does not reflect that before sentence was imposed defendant had 'expressly' waived the twenty-four hour delay after his motions for a new trial and in arrest of judgment had been overruled. Hence, the sentence must be vacated and the case remanded to the trial court with instructions to the trial judge to sentence defendant in accordance with law.

*Kelly*, 375 So.2d at 1349.

13

So.2d 1331, 1333–34 (La. 1990) (emphasis added) the supreme court held that the delay provisions of La. CodeCrim.P. art. 873[3] **are mandatory and any sentence imposed in violation of these delay periods is null:**

> The last issue before us concerns the mandatory delays specified in La.C.Cr.P. art. 873 which must be observed before sentence can be imposed. Art. 873 first provides for a three-day delay between conviction of the defendant and sentencing. (The original provision provided for a 24-hour delay. That was amended to three days in the 1966 Code of Criminal Procedure. 1966 La. Acts No. 310, § 1). The second requires a 24-hour delay between the denial of a new trial or judgment for acquittal and sentencing. These statutorily mandated delays have been respected in a long line of opinions. *State v. Mistich,* 186 La. 174, 171 So. 841 (1937) called a sentence "premature and therefore void," because the sentence was imposed within the then 24-hour delay required between conviction and sentence. In *State v. George,* 218 La. 18, 48 So.2d 265 (1950), cert. denied, 340 U.S. 949, 71 S.Ct. 528, 95 L.Ed. 684 (1951), the Court also addressed that same 24-hour delay, and found that "if [defendant] is denied the right to this delay, any sentence so imposed is void."
>
> More recent decisions of this Court include a per curiam opinion in *State v. Hampton,* 274 So.2d 383 (La.1973), and a pair of decisions authored by Justice Marcus, *State v. Young,* 337 So.2d 1196 (La.1976) and *State v. Hutto,* 349 So.2d 318 (La.1977). These cases all involved a violation of the delay between denial of a new trial motion and sentencing. In *Hutto* and *Young,* the Court found that the sentence was "illegally imposed" when, just as in this case under review, both of those defendants were sentenced within 24 hours after denial of new trial motions, with neither having waived the delay. These are only a few of such decisions by this Court holding that violation of art. 873 requires remand for resentencing.
>
> > Article 873 uses mandatory language in requiring that twenty-four hours elapse between the overruling of a motion for new trial and sentencing when the defendant is convicted of a felony. ... The legislature in effect has said that a failure to comply with article 873 in the absence of an express waiver by the defendant affects substantial rights.

---

[3]  If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

La. CodeCrim.P. art. 873.

*State v. White,* 483 So.2d 1005 (La.1986), Dennis, J., dissenting in part.

Only the majority opinion in *State v. White,* 404 So.2d 1202 (La.1981) can possibly be considered at variance with this rule. But even that case is largely distinguishable from this one. We held in *White* (over the protest of two dissenting justices) that the statutory mandate of the 24-hour delay was not so imperative as to require a resentencing where the defendant could not show that he suffered prejudice from the violation. *State v. White,* however, was before us on an errors patent review (no assignments of error urged by the defendant on this issue), and the defendant was not challenging the penalty imposed.

In the case before us, Augustine did not expressly waive the delay as required by art. 873 (nor did he plead guilty); and he *does* challenge the penalty on this appeal.

Furthermore, there is no assurance that this is a "useless formality for reimposition of sentence," as was the majority's conclusion in *White.* For all we know, a reimposition might result in a sentence less than 40 years for this man, who was 18 years old at the time of the offense, who robbed his victim with a racing starter's pistol, and who did not have any prior convictions at the time of the offense. The fact that defendant Augustine has already served 18 of his 40 years before the appeal was reviewed is no reason to deny him the treatment afforded the defendants Hutto, Young, Hampton, Scott, George, Mistich and others (citations to these cases above), who were ordered resentenced *shortly* after conviction.

*The suggestion that the defendant was not harmed because his sentence was in fact not unconstitutionally excessive is not meritorious.* Constitutional excessiveness of sentence and illegal imposition of sentence are quite separate and distinct matters. *A sentence illegally imposed, even one not constitutionally excessive, is null, and constitutes no valid premise for continued incarceration.* Furthermore, the district court (upon resentencing) is not bound by the sentence previously imposed, whereas this Court is bound by a legally imposed sentence which is not unconstitutionally excessive.

In *State v. Williams*, 96-37 (La.App. 3 Cir. 6/26/96), 677 So.2d 692, this court, relying on *Augustine*, recognized the failure to follow the mandatory delays for sentencing provided in La. CodeCrim. P. art 873 as *an error patent* and we held there that when a defendant challenges the sentence imposed "*Augustine* mandates a remand." *Id*. at 699. *In this case Defendant raises the issue as an assignment of error and Defendant challenges his sentence in this appeal*. In *Williams* we said:

The first error patent involves whether there was proper delay in sentencing defendant. Defendant also claims as an assignment of error that the trial court failed to observe the twenty-four hour sentencing delay provided in La.Code Crim.P. art. 873. Defendant argues this assignment of error in his brief, but it was not formally specified as an error in the trial court in accordance with Uniform Rules-Courts of Appeal, Rule 1-3 and La.Code Crim.P. art. 920(1). **However, we will address this error as it is an error patent.**

In *State v. Dauzat,* 590 So.2d 768, 775 (La.App. 3 Cir.1991), *writ denied,* 598 So.2d 355 (La.1992), this court stated: La.C.Cr.P. art. 873 requires that there be a 24 hour delay between the denial for a motion for a new trial and the imposition of sentence. *Generally, this error, while patent*, is not reversible unless the defendant is prejudiced by the lack of a sentencing delay. *State v. Gaspard,* 441 So.2d 812, 813 (La.App. 3d Cir.1983), citing *State v. White,* 404 So.2d 1202 (La.1981). However, *the Louisiana Supreme Court's most recent pronouncement on this issue has required a strict application of Article 873, particularly where the defendant challenges the penalty imposed. State v. Augustine,* 555 So.2d 1331 (La.1990). Because defendant's counsel did not argue the motion for new trial, it is difficult to find any prejudice to the defendant in the trial court's failure to observe the sentencing delay in Article 873. *However, as defendant is challenging the penalty imposed, we find Augustine mandates a remand.*

In the present case, defendant filed a motion for new trial which was denied by the trial court after a hearing on September 15, 1995. Immediately after denying defendant's motion, the trial court proceeded with the sentencing and sentenced defendant to twenty years at hard labor. Since defendant challenges the sentence on appeal, this error is not harmless. In *State v. Augustine,* 555 So.2d 1331, 1334 (La.1990), the court held that *"[a] sentence illegally imposed, even one not constitutionally excessive, is null, and constitutes no valid premise for continued incarceration.* Furthermore, the district court (upon resentencing) is not bound by the sentence previously imposed, whereas this Court is bound by a legally imposed sentence which is not unconstitutionally excessive." Thus, we find the trial court erred by not observing the delay. The sentence should be vacated and the case remanded to the trial court for resentencing.

*Williams*, 677 So.2d at 699 (emphasis added).

I note too, our state supreme court has held that a defendant may rebut the presumption that a mandatory sentence is constitutional with clear and convincing evidence that demonstrates he is an exception for which "the legislature failed to assign a sentence meaningfully tailored to the culpability of the offender, the gravity

of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906 p. 7, (La. 3/4/98), 709 So.2d 672, 676. Such a rebuttal results in a downward departure from the mandatory sentence. *Id.* This was Defendant's first felony conviction. Moreover, the ten-two verdict indicates at least two jurors had reasonable doubt about Defendant's guilt. *But, as indicated, this case presents more problems.*

***Impeachment of K.A.'s testimony.***

The majority rejects defendant's arguments asserting he was denied his constitutional right to present a defense. I disagree with the majority's finding that Defendant "never attempted to present any evidence of [the victim's reputation for truthfulness] other than the proffered testimony of Ms. Jinks." The majority says the Defendant "did not offer evidence of the victim's general reputation in the community" but instead "attempted to disprove her credibility and attack her character for truthfulness with evidence of her alleged untruthfulness in two specific incidences from a witness who only *had firsthand knowledge that the victim made the accusations*, not of the truthfulness of those accusations" (emphasis added). I totally disagree with this assessment and I do not believe it reflects the law. The majority acknowledges that Ms. Jinks has "firsthand knowledge" of the statements made by K.A. Defendant introduced Ms. Jinks' testimony *to directly impeach the victims' testimony* at trial. *He did not offer the testimony for the truth of the matter asserted*, i.e., that Defendant had previously lied on two occasions about being touched by males. **Instead, he offered Ms. Jinks' firsthand testimony to impeach Defendant's in-court assertion that she had never accused anyone else of inappropriately touching her**. On cross examination defense counsel asked K.W. the following series of questions (emphasis added):

> Q. Okay. And during those other—those first six years or so, *anything ever happen that you haven't told us about or?*

17

A. Not really.

Q. Okay. All right. Has—and I know also, that you—you know, you have a—a stepsister and stepbrothers and some time they get on your nerves and everything, and I understand that. Was there ever a time during those years that y'all were all living together that anything else happened with them? Did they ever do anything they shouldn't have done or—

A. No, sir.

Q. *–anything like that?*

A. No, sir.

Q. Okay. All right. And you've never had any other incident like this with your dad, or your mom, or—or your other fathers? I mean—

A. No, sir.

When defense counsel argued that Ms. Jinks' testimony was admissible because of its impeachment value he said:

> But the fact is that this whole case, everything, is on the truthfulness of this child. A child says she has never ever been touched or anything like this has never happened to her before. This is the whole case—it's her—it's her—the strength of her testimony and the truthfulness of her . . .

**Neither the trial judge nor the prosecution asserted that the child's testimony did not amount to such a representation**. Instead, the prosecutor argued that Ms. Jinks' proferred testimony was inadmissible hearsay offered for the truth of the matter asserted i.e., that K.A. had falsely accused three individuals in the recent past of improperly touching her. But that was not the purpose for which the proferred testimony was offered. The trial court, too, made its ruling based on the witnesses' lack of knowledge concerning the truthfulness of K.A.'s statements rather than on the issue of the proferred testimony's impeachment value. The trial court explained its rationale for not allowing Ms. Jinks' testimony:

> I'm concerned about the foundation. I don't feel like there was a sufficient foundation for her to testify as to this. She doesn't know when it happened. She doesn't have any details other than she said this.

It seems suspicious to the Court that she would testify to this today with the limited information that she provided—the conclusory nature of her testimony.

Clearly, the trial court did not assess the admissibility of Ms. Jinks' testimony on the basis of its impeachment value, but solely based its reasoning on the notion that Ms. Jinks could not offer testimony to explain how she would know whether K.A.'s accusations were truthful or not. But Ms. Jinks' knowledge of that information is of no moment. Both the trial judge and the majority acknowledge that *Ms. Jinks heard the child make these accusations* and that is the very point of Ms. Jinks' testimony—K.A.'s representation in her testimony that "she has never ever been touched or anything like this has never happened to her before" would have been impeached by Ms. Jinks' testimony that she is aware of two occasions when K.A. made such accusations. The testimony was not being offered to determine whether K.A.'s out-of-court representations were false, but rather to show that her in-court testimony was not truthful. Because this was a ten-two verdict, if only one juror was swayed in Defendant's favor because of this testimony the outcome would have been different. This was critical to Defendant's defense and is not harmless error in this case where the only evidence to convict is the victim's word and the verdict hinges solely on the complete creditworthiness of the victim. Defendant was denied the opportunity to present evidence that jurors may have found challenged the victim's veracity and thereby establish reasonable doubt. ***The standard applicable to this alleged error is whether we can say beyond a reasonable doubt the denial of presenting this impeachment evidence to the jury did not result in the conviction.*** *State v. Owunta*, 99-1569 (La. 5/26/00), 761 So.2d 528, and cases cited therein.

The credibility of a witness may be attacked as provided in La.CodeEvid. art. 607(D)(2) (emphasis added):

Other extrinsic evidence, *including prior inconsistent statements and evidence contradicting the witness' testimony*, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

Under the provisions of La.Code Evid. art. 801(D)(1)a., the statements offered through Ms. Jinks' testimony are not hearsay:

**D. Statements which are not hearsay.** A statement is not hearsay if:

**(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement. . .

In *Owunta* the supreme court granted writs and reversed the appellate court "because the court of appeal misapplied the rule excluding use of such statements for their hearsay content as a rule precluding extrinsic proof of the prior statement for *any* purpose, *even one long recognized by Louisiana law*." *Id.* at 529 (emphasis added). The court in *Owunta* explained that:

Louisiana has long sanctioned the impeachment of a witness in criminal trials by his or her prior inconsistent statements. La.C.E. art. 607(D)(2); former La.R.S. 15:493; *State v. Gabriel,* 450 So.2d 611, 616 (La.1984); *State v. Mosely,* 360 So.2d 844, 845 (La.1978); *State v. Rudolph,* 332 So.2d 806, 813 (La.1976). Provided that the witness has had a fair opportunity "to admit the fact and has failed distinctly to do so," La.C.E. art. 613, extrinsic evidence of the statement is admissible, *not to prove the truth of the matter asserted, i.e., not for its hearsay content, but to establish the fact of contradiction as a means of impeaching witness's general credibility. State v. Cousin,* 96-2973, p. 8 (La.4/14/98), 710 So.2d 1065, 1069. In this regard, Louisiana has followed the minority rule that such prior inconsistent statements "simply do not constitute substantive evidence." *State v. Allien,* 366 So.2d 1308, 1311 (La.1978); *cf. California v. Green,* 399 U.S. 149, 164, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970)("[T]here is little difference as far as the Constitution is concerned between permitting prior inconsistent statements to be used only

for impeachment purposes, and permitting them to be used for substantive purposes as well.")...

In this prosecution on five counts of carnal knowledge of a juvenile in violation of La.R.S. 14:80, the centerpiece of trial became an audio tape of a confrontation arranged by the victim, Channel Williams, and her brother, Derrick, in their residence with relator two weeks before the victim reported the crimes to her mother and then to the police. In that taped conversation, the meaning of which was sharply contested at trial, the victim accused relator of the crimes and asked him whether he would provide the family with a home and a car. The core of the defense was that the tape provided evidence of an extortion plot by the victim and her brother targeting relator, a college professor who had tutored the victim at home at the request of her mother, one of relator's former students. Relator explained to jurors at trial that the charges of sexual misconduct were completely false and that he "knew they were after blackmail and extortion because they were very desperate people."

The victim and her brother denied the extortion plan and Derrick specifically denied discussing the alleged plot with his barber, Mark Fortier. The victim's older sister, Catina, who had been home at the time the confrontation between the victim and relator took place, denied any knowledge that her sister and brother were trying to force relator to give them a home and a car. Catina also denied speaking about the alleged extortion plot with Fortier, a former boyfriend, and asking him to intervene. During Fortier's testimony, the trial court sustained the state's repeated hearsay objections and thereby prevented the witness from testifying with regard to statements made to him by Derrick and Catina in which, the defense claimed, they revealed their knowledge of, and in Derrick's case, participation in, a plan to extort gifts from relator. The court did allow Fortier to describe his side of his conversation with Derrick in which he warned the victim's brother that he did not know what he was doing and could get himself "in a whole lot of trouble."

The jury found relator guilty on a single count of carnal knowledge, the only count for which the state provided independent corroborating evidence placing relator's car outside the victim's residence on the afternoon of the offense. On appeal, a majority of the court of appeal panel rejected relator's argument that the trial court had improperly curtailed defense efforts to impeach Derrick and Catina, finding that the statements "were not prior inconsistent statements of the witness at hand, the barber, but of other witnesses ...," and were thus properly excluded as hearsay. *State v. Owunta,* 98-0006, p. 8 (La.App. 4 th Cir. 3/31/00), 734 So.2d 57, 61. Dissenting from that view, Judge Plotkin argued that defense counsel had provided Derrick and Catina with a fair opportunity to admit or deny making any statements to Fortier about the allege extortion plan, that the witness's denials of those conversations rendered extrinsic evidence admissible to prove the fact of the prior statements if jurors found that testimony credible, and

that the trial court's rulings precluding that extrinsic evidence of those statements were not harmless because **"attacking [the] victim's credibility was crucial to the defendant."** *Owunta,* 98-0006 at 3-6, 734 So.2d at 61-62.

The record fully supports the dissenting views of Judge Plotkin. In his opening statement to the jury, defense counsel promised he would expose the prosecution of relator as the result of an unsuccessful extortion plot confected by the victim and her brother which then led to the filing of (false) criminal charges when relator ultimately refused to accede to their demands. Cross-examination of Derrick and direct examination of Catina, called as a defense witness, elicited their denials of a plan to extort money and gifts from relator and denials of having discussed the alleged extortion plot with Fortier. At that point, it was entirely proper for defense counsel to call Fortier for purposes of impeaching the siblings' testimony by establishing that Catina had asked Fortier to intervene, *see* La.C.E. art. 607(A)("The credibility of a witness may be attacked by any party, including the party calling him."), and that Fortier had then discussed the extortion plot with Derrick, and warned him of the potential consequences. Defense counsel offered Fortier's testimony *for impeachment purposes only and made no argument that the prior statements offered substantive evidence of the alleged extortion plot because they constituted declarations against penal interest. Cf.* La.C.E. art. 804(B)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."). *Given the limited purpose for which the defense intended to introduce evidence of the prior statements, the trial court erred in sustaining the state's hearsay objections and excluding Fortier's testimony on these points, as opposed to giving a limiting instruction to jurors regarding the proper use of the testimony. See* La.C.E. art. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."); *State v. White,* 450 So.2d 648, 651 (La.1984).

We also agree with Judge Plotkin that the trial court's rulings *did not constitute harmless error.* The acquittals of relator on four counts and their conviction of him on one count reflected the jurors reluctance to accept the uncorroborated testimony of either the victim or relator as to allegations of sexual abuse or of an extortion plot. While the defense could not use Fortier's testimony as substantive evidence of the extortion scheme, his testimony bore directly on the credibility of both the victim and her brother. Fortier's two prior felony convictions may have eroded his general credibility with jurors, *see* La. C.E. art. 609.1(B), but the victim's testimony that in the course of committing his sexual assaults relator had displayed a birthmark on his upper hip, described by her as a "big discoloration ... very noticeable," had damaged her credibility as well. After an in-

chambers conference during which relator partially disrobed, the state entered into a stipulation with the defense that relator had "a small scar on his left side but no discoloration." Under these circumstances, we cannot say that beyond a reasonable doubt the trial court's rulings did not affect the jury's verdict on the remaining count. *See State v. Everidge*, 96-2665, p. 8 (La.12/2/97), 702 So.2d 680, 685 ("**A reviewing court must find beyond a reasonable doubt that excluded evidence could not have affected the jury's verdict for the error to be harmless.**") (citing *State v. Sanders,* 93-0001, p. 25 (La.11/20/94), 648 So.2d 1272, 1291).

Accordingly, the decision of the court of appeal is reversed, relator's conviction and sentence are vacated, and this case is remanded to the district court for further proceedings consistent with the views expressed herein.

*State v. Owunta*, 761 So.2d at 529–31(emphasis added).

Likewise, in this case the best defense Defendant had to K.A.'s testimony was to attack her credibility through prior inconsistent statements. Such testimony had the potential to affect at least one more juror's mind which would have resulted in a hung jury. Even without that testimony two jurors had reasonable doubt concerning Defendant's guilt and that doubt could only have stemmed from their unwillingness to fully credit K.A.'s testimony as there was no other evidence of Defendant's guilt to weigh.

Assuming a proper foundation, the credibility of any witness may be attacked by extrinsic evidence, including prior inconsistent statements. LSA–C.E. art. 607(D). Admission of the evidence requires a judicial determination that the probative value of the extrinsic evidence is not substantially outweighed by undue consumption of time, confusion, or unfair prejudice. LSA–C.E. art. 607(D); *State v. Cousin,* 96–2673, pp. 12–13 (La.4/14/98), 710 So.2d 1065, 1071.

*State ex rel. D.W.*, 09-855 (La. App. 5 Cir. 9/14/10), 47 So. 3d 1048, 1058.

K.A. testified at trial on the witness stand and through her videotaped interview. She was available for cross examination regarding the alleged inconsistency of her testimony and the statements that Ms. Jinks says K.A. uttered in her presence in the recent past. Here there is no issue of any undue consumption of time as Ms. Jinks' proferred testimony was very brief. Moreover, the probative

value far outweighed any issue of confusion or unfair prejudice and both factors could be addressed by proper jury instructions.

> The history of Louisiana's harmless error rule makes clear that there has been one common directive: appellate courts should not reverse convictions for errors *unless the accused's substantial rights have been violated*. *State v. Johnson,* 94–1379 (La.11/27/95), 664 So.2d 94. This comports with the general theory that "appeals in criminal cases are not granted merely to test the correctness of the trial court's ruling, but only to rectify injuries caused thereby." *State v. Saia,* 212 La. 868, 876, 33 So.2d 665, 668 (1947). In sum, the court of appeal majority should have determined whether the jury's verdict in the present case was surely unattributable to the erroneous admission of the identity of the victim in the prior crime, as a result of the state's violation La.Code Evid. art. 609.1, and whether this error was harmless beyond a reasonable doubt. *State v. Sanders,* 93–0001, p. 25 (La.11/30/94), 648 So.2d 1272, 1291.

*State v. Leonard*, 05-1382, pps. 12-13 (La. 6/16/06), 932 So.2d 660, 668.

In *State v. Adams*, 11-1052 (La.App. 5 Cir. 5/16/13), 119 So.3d 46, *writ denied*, 13-1413 (La. 12/6/13), 129 So.3d 531, the defendant's attorney tried to introduce out-of-court testimony of a witness, Ms. Bell, to impeach her trial testimony that defendant committed the murder. Ms. Bell had remarked after the murder that she agreed to testify because she knew defendant "had not committed the murder." *Id*. at 57. But at trial she testified defendant committed the murder. The trial court excluded Ms. Bell's proferred testimony as inadmissible hearsay. The defense argued he was introducing Ms. Bell's prior out-of-court statement to impeach her in-court testimony. In overturning the trial court's refusal to permit the proferred testimony the court of appeal held:

> Hearsay is a statement made out of court offered as evidence in court to prove the truth of the matter asserted by the statement. *State v. Everidge,* 96–2665 (La.12/2/97), 702 So.2d 680, 685 (citations omitted). Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. *Id.* In order to fall within the definition of hearsay, the statement must be offered to prove the truth of the statement's contents. *Id.* In the present case, Ms. Bell's out-of-court statement was that she knew defendant didn't commit the murder. As defense counsel stated in his objection to the

trial court's ruling, this evidence was offered not for the truth of the matter asserted, but for impeachment purposes since Ms. Bell had testified at trial that defendant did commit the murder. Therefore, such testimony is not hearsay evidence offered for the truth of the matter asserted; rather, the testimony was offered to impeach Ms. Bell's trial testimony that defendant did murder the victim.

The Louisiana Supreme Court has recognized that La. C.E. art. 607(D)(2) permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. *State v. Cousin,* 96–2973 (La.4/14/98), 710 So.2d 1065. Thus, even if this evidence constituted inadmissible hearsay, we find it nevertheless admissible for impeachment purposes. Accordingly, we find the trial court abused its discretion in prohibiting defendant's testimony regarding conversations he had with Ms. Bell after the shooting that would directly contradict Ms. Bell's trial testimony.

*Id*.

This rationale is applicable here. K.A.'s out-of-court statement is not hearsay. She was available to be cross-examined regarding the statements she made to Ms. Jinks and it was not being offered for the truth of the matters asserted in the statements:

Hearsay evidence is inadmissible in criminal trials except as provided by statute or through jurisprudentially established exceptions. La.R.S. 15:434; *State v. Brown,* 395 So.2d 1301 (La.1981). Hearsay evidence is testimony in court of a statement made out of court, being offered to show the truth of the matter asserted therein, and resting its value upon the credibility of the out-of-court asserter. *State v. Martin,* 458 So.2d 454 (La.1984). *Evidence is not hearsay if it is introduced to show that the utterance occurred or that the conversation took place rather than to show the truth of the matter asserted. State v. Ratcliff,* 416 So.2d 528 (La.1982).

*State v. LeBlanc*, 517 So.2d 951, 957 (La. 3 Cir. 1987), *writ granted in part*, *denied in part*, 519 So.2d 123 (La.1988).

This error alone warrants a reversal of Defendant's conviction.

*Non-unanimous verdict*.

I agree with the majority that a ten-two verdict has been held constitutional prior to the time this case was decided. It would not now, however, be enough to convict under our new unanimous verdict law voted on by the citizens of Louisiana. **Certainly, Louisiana's historic racial basis for its non-unanimous verdict law provides no support for upholding its constitutionality and, in fact, provides persuasive evidence of its unconstitutionality.** Not surprisingly, the only other state that continues to allow this aberrant practice, Oregon, also rooted its law in racism as explained in "Pressure Grows on Oregon to End Non-Unanimous Verdicts": Law 360, Lexis Nexus, accesstojustice@law360.com, Nov. 18, 2018:

> Oregon's law is also rooted in racism dating back to 1934 when the state passed an amendment following a notorious trial that involved a Jewish man accused of murder. Against the backdrop of simmering anti-Semitism and a robust Klu Klux Klan presence, defendant Jacob Silverman was accused of killing a Protestant man named Jimmy Walker. Local newspapers followed every development in the case closely. During deliberations 11 0f 12 jurors wanted to convict Silverman on second-degree murder, but one juror wanted to acquit. After nearly 17 hours of discussion the jurors compromised with a conviction for manslaughter—and instead of life behind bars, Silverman, was sentenced to three years in prison and a $1,000 fine.
>
> The Morning Oregonian published editorials stating that "the vast immigration into America from southern and eastern Europe, of people untrained in the jury system, have combined to make the jury of twelve increasingly unwieldy and unsatisfactory."

It was less than a month later that the Oregon Legislature proposed a constitutional amendment allowing non-unanimous verdicts which passed by 58% of the vote. Thus, the historic roots of non-unanimous jury verdicts in the only two states to alter this fundamental constitutional requirement offers strong reason to denounce the practice.

**The United States Supreme Court is scheduled to consider this very question on its current docket.** I am mindful of the previous rulings of the courts

on this subject, but I do not agree with the existing jurisprudential reasoning. **I think it is telling that the United States Supreme Court has granted certiorari** in a Louisiana case, *Ramos v. Louisiana*, No. 18-5924, 2019 WL 1231752 (U.S. Mar. 18, 2019), which will be heard and decided this fall. In *State v. Ramos*,16-1199 (La.App. 4 Cir. 11/2/17), 231 So.3d 44, the fourth circuit felt it was constrained to find no merit to the defendant's contention that his non-unanimous jury verdict was unconstitutional. The appellate court explained its decision as follows:

> In *State v. Bertrand*, 2008-2215 (La. 3/17/09), 6 So.3d 738, the trial court found that La. C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:

>> Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.

> *Bertrand*, 2008–2215, p. 8, 6 So.3d at 743.

> This Court cited and relied on *Bertrand* in *State v. Hickman*, 2015-0817, pp. 13-14 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1168–69, to reject the argument that the trial court had erred in denying the defendant's motion to declare La. C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

> As stated by the Louisiana Supreme Court in *Bertrand*, under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La. C.Cr.P. art. 782(A) is constitutional.

*State v. Ramos*, 16-1199, pps. 9-10, (La.App. 4 Cir. 11/2/17), 231 So.3d 44, 54, *writ denied*, 2017-2133 (La. 6/15/18), 257 So.3d 679, and *writ denied, State ex rel.*

*Evangelisto Ramos v. State*, 17-1177 (La. 10/15/18), 253 So.3d 1300, and *cert. granted*, No. 18-5924, 2019 WL 1231752 (U.S. Mar. 18, 2019).

The Louisiana Supreme Court denied writs without comment. The United States Supreme Court however, granted certiorari in the case and has docketed the case for decision this fall. With the recent passage in Louisiana of a constitutional amendment requiring unanimous jury verdicts for convictions in cases such as Ramos and this Defendant, one of the last two vestiges of this unconstitutional practice is gone, except that Louisiana's law is only prospective as of January 1, 2019. Only the State of Oregon still allows non-unanimous verdicts and as of April 5, 2019, its legislature is poised to put the matter to a statewide vote to do away with this aberrant practice. While we cannot know how the high court will rule, it defies logic and the court's recent history to think certiorari was granted in *Ramos* to uphold Louisiana's rulings in that case. Mr. Ramos' crime and conviction predate Defendant's. Thus, a favorable ruling by the U.S. Supreme Court would invalidate this conviction. Given the high court's recent history of applying other provisions of the Bill of Rights to the states through the Fourteenth Amendment it is likely that the court will find our prior law, unconstitutional.

*When the U.S. Supreme Court held that a non-unanimous verdict in a six-person jury trial is unconstitutional it noted that the vast majority of states, unlike Oregon and Louisiana, required unanimous verdicts for six-person juries as they did for twelve member juries.* Notably, the U.S. Supreme Court in *Burch v. Louisiana*, 441 U.S. 130, 131–39, 99 S. Ct. 1623, 1624–28, 60 L. Ed. 2d 96 (1979) held that: "conviction by a non-unanimous six-member jury in a state criminal trial for a non-petty offense deprives an accused of his constitutional right to trial by jury." The reasoning that resulted in this decision is very telling as to the likely outcome of the high court's upcoming ruling in *Ramos*. And one must remember

28

that the U.S. Supreme Court held as far back as 1948 that **"[u]nanimity in jury verdicts is required where the Sixth and Seventh Amendments apply**. In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury," *Andres v. United States*, 333 U.S. 740, 748, 68 S. Ct. 880, 884, 92 L. Ed. 1055 (1948) (emphasis added), permanently settling the issue for federal trials. In *Burch* the high court explained its decision requiring unanimity in six-person jury verdicts:

> The Louisiana Constitution and Code of Criminal Procedure provide that criminal cases in which the punishment imposed may be confinement for a period in excess of six months "shall be tried before a jury of six persons, five of whom must concur to render a verdict." We granted certiorari to decide whether conviction by a nonunanimous six-person jury in a state criminal trial for a nonpetty offense as contemplated by these provisions of Louisiana law violates the rights of an accused to trial by jury guaranteed by the Sixth and Fourteenth Amendments. 439 U.S. 925, 99 S.Ct. 307, 58 L.Ed.2d 317 (1978).

> Petitioners, an individual and a Louisiana corporation, were jointly charged in two counts with the exhibition of two obscene motion pictures. Pursuant to Louisiana law, they were tried before a six-person jury, which found both petitioners guilty as charged. A poll of the jury after verdict indicated that the jury had voted unanimously to convict petitioner Wrestle, Inc., and had voted 5-1 to convict petitioner Burch. Burch was sentenced to two consecutive 7-month prison terms, which were suspended, and fined $1,000; Wrestle, Inc., was fined $600 on each count.

> Petitioners appealed their convictions to the Supreme Court of Louisiana, where they argued that the provisions of Louisiana law permitting conviction by a nonunanimous six-member jury violated the rights of persons accused of nonpetty criminal offenses to trial by jury guaranteed by the Sixth and Fourteenth Amendments. *Though acknowledging that the issue was "close,"* the court held that conviction by a nonunanimous six-person jury did not offend the Constitution. *State v. Wrestle, Inc.*, 360 So.2d 831, 838 (1978). The court concluded that none of this Court's decisions precluded use of a nonunanimous six-person jury. " 'If 75 percent concurrence ($^9/_{12}$) was enough for a verdict as determined in *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), then requiring 83 percent concurrence ($^5/_6$) ought to be within the permissible limits of *Johnson.*' " *Ibid.*, quoting Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 56 n. 300 (1974). And our recent decision in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d

234 (1978), striking down a Georgia law allowing conviction by a unanimous five-person jury in nonpetty criminal cases, was distinguishable in the Louisiana Supreme Court's view:

> [I]n *Williams* [*v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)] the court held that a six-person jury was of sufficient size to promote adequate group deliberation, to insulate members from outside intimidation, and to provide a representative cross-section of the community. These values, which *Ballew* held a five-person jury is inadequate to serve, are not necessarily defeated because the six-person jury's verdict may be rendered by five instead of by six persons.

360 So.2d, at 838.

Since the Louisiana Supreme Court believed that conviction by a nonunanimous six-person jury was not necessarily foreclosed by this Court's decisions, it stated that it preferred to "indulg[e] in the presumption of federal constitutionality which must be afforded to provisions of our state constitution." *Ibid.*

We agree with the Louisiana Supreme Court that the question presented is a "close" one. Nonetheless, **we believe that conviction by a non-unanimous six-member jury in a state criminal trial for a non-petty offense deprives an accused of his constitutional right to trial by jury.**

Only in relatively recent years has this Court had to consider the practices of the several States relating to jury size and unanimity. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), marked the beginning of our involvement with such questions. The Court in *Duncan* held that because trial by jury in "serious" criminal cases is *"fundamental to the American scheme of justice" and essential to due process of law, the Fourteenth Amendment guarantees a state criminal defendant the right to a jury trial in any case which, if tried in a federal court, would require a jury under the Sixth Amendment. Id.,* at 149, 158-159, 88 S.Ct., at 1447, 1452-1453. Two Terms later in *Williams v. Florida*, 399 U.S. 78, 86, 90 S.Ct. 1893, 1898, 26 L.Ed.2d 446 (1970), the Court held that this constitutional guarantee of trial by jury did not require a State to provide an accused with a jury of 12 members and that Florida did not violate the jury trial rights of criminal defendants charged with non-petty offenses by affording them jury panels comprised of only 6 persons. After canvassing the common-law development of the jury and the constitutional history of the jury trial right, the Court concluded that the 12-person requirement was "a historical accident" and that there was no indication that the Framers intended to preserve in the Constitution the features of the jury system as it existed at common law. *Id.,* at 89-90, 90 S.Ct., at 1899-1900. Thus, freed from strictly historical considerations, the Court turned to examine the function that this

particular feature performs and its relation to the purposes of jury trial. *Id.,* at 99-100, 90 S.Ct., at 1905-1906. *The purpose of trial by jury, as noted in Duncan, is to prevent government oppression by providing a "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge."* 391 U.S., at 156, 88 S.Ct., at 1451. Given this purpose, the *Williams* Court observed that the jury's essential feature lies in the "interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." 399 U.S., at 100, 90 S.Ct., at 1906. These purposes could be fulfilled, the Court believed, so long as the jury was of a sufficient size to promote group deliberation, free from outside intimidation, and to provide a fair possibility that a cross section of the community would be represented on it. *Ibid.* The Court concluded, however, that there is "little reason to think that these goals are in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12-***particularly if the requirement of unanimity is retained*.***" *Ibid.* (emphasis added).

A similar analysis led us to conclude in 1972 that a jury's verdict need not be unanimous to satisfy constitutional requirements, *even though unanimity had been the rule at common law*. Thus, in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), we upheld a state statute providing that only 10 members of a 12-person jury need concur to render a verdict in certain noncapital cases. In terms of the role of the jury as a safeguard against oppression, *the plurality opinion* perceived no difference between those juries required to act unanimously and those permitted to act by votes of 10 to 2. 406 U.S., at 411, 92 S.Ct., at 1633. Nor was unanimity viewed by *the plurality* as contributing materially to the exercise of the jury's common-sense judgment or as a necessary precondition to effective application of the requirement that jury panels represent a fair cross section of the community. *Id.,* at 410, 412, 92 S.Ct., at 1632, 1633.

Last Term, in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), we considered whether a jury of less than six members passes constitutional scrutiny, a question that was explicitly reserved in *Williams v. Florida*. See 399 U.S., at 91 n. 28, 90 S.Ct., at 1901 n. 28. The Court, in separate opinions, held that conviction by a unanimous five-person jury in a trial for a non-petty offense deprives an accused of his right to trial by jury. While readily admitting that the line between six members and five was not altogether easy to justify, at least five Members of the Court believed that reducing a jury to five persons in non-petty cases raised sufficiently substantial doubts as to the fairness of the proceeding and proper functioning of the jury to warrant drawing the line at six. See 435 U.S., at 239, 98 S.Ct., at 1038 (opinion of Blackmun, J.); *id.,* at 245-246, 98 S.Ct., at 1042 (opinion of Powell, J.).

We thus have held that the Constitution permits juries of less than 12 members, but that it requires at least 6. *Ballew v. Georgia, supra; Williams v. Florida, supra.* And we have approved the use of certain non-unanimous verdicts in cases involving 12-person juries. *Apodaca v. Oregon, supra* (10-2); *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (9-3). *These principles are not questioned here.* Rather, this case lies at the intersection of our decisions concerning jury size and unanimity. As in *Ballew*, we do not pretend the ability to discern *a priori* a bright line below which the number of jurors participating in the trial or in the verdict would not permit the jury to function in the manner required by our prior cases. 435 U.S., at 231-232, 98 S.Ct., at 1034-1035 (opinion of Blackmun, J.); *id.*, at 245-246, 98 S.Ct., at 1042 (opinion of Powell, J.); see *Williams v. Florida, supra,* 399 U.S. at 100, 90 S.Ct. at 1905. But having already departed from the strictly historical requirements of jury trial, *it is inevitable that lines must be drawn somewhere if the substance of the jury trial right is to be preserved.* Cf. *Scott v. Illinois*, 440 U.S. 367, 372, 99 S.Ct. 1158, 1161, 59 L.Ed.2d 383 (1979); *Baldwin v. New York*, 399 U.S. 66, 72-73, 90 S.Ct. 1886, 1890-1891, 26 L.Ed.2d 437 (1970) (plurality opinion); *Duncan v. Louisiana*, 391 U.S., at 161, 88 S.Ct., at 1453. Even the State concedes as much. Tr. of Oral Arg. 26-27.

This line-drawing process, "although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." *Duncan v. Louisiana, supra,* at 161, 88 S.Ct., at 1453; see *Baldwin v. New York, supra,* 399 U.S. at 72-73, 90 S.Ct. at 1890-1891 (plurality opinion). **However, much the same reasons that led us in *Ballew* to decide that use of a five-member jury threatened the fairness of the proceeding and the proper role of the jury, lead us to conclude now that conviction for a non-petty offense by only five members of a six-person jury presents a similar threat to preservation of the substance of the jury trial guarantee and justifies our requiring verdicts rendered by six-person juries to be unanimous.** *We are buttressed in this view by the current jury practices of the several States. It appears that of those States that utilize six-member juries in trials of non-petty offenses<u>, only two, including Louisiana, also allow non-unanimous verdicts</u>.* <u>**We think that this near-uniform judgment of the Nation provides a useful guide in delimiting the line between those jury practices that are constitutionally permissible and those that are not.**</u> See *Baldwin v. New York, supra,* at 70-72, 90 S.Ct., at 1888-1890 (plurality opinion); *Duncan v. Louisiana, supra,* 391 U.S., at 161, 88 S.Ct., at 1453; *District of Columbia v. Clawans*, 300 U.S. 617, 628, 57 S.Ct. 660, 663, 81 L.Ed. 843 (1937).

The State seeks to justify its use of non-unanimous six-person juries on the basis of the "considerable time" savings that it claims results from trying cases in this manner. It asserts that under its system, juror deliberation time is shortened and the number of

hung juries is reduced. Brief for Respondent 14. Undoubtedly, the State has a substantial interest in reducing the time and expense associated with the administration of its system of criminal justice. *But that interest cannot prevail here.* First, on this record, any benefits that might accrue by allowing five members of a six-person jury to render a verdict, as compared with requiring unanimity of a six-member jury, are speculative, at best. More importantly, we think that when a State has reduced the size of its juries to the minimum number of jurors permitted by the Constitution, the additional authorization of non-unanimous verdicts by such juries sufficiently threatens the constitutional principles that led to the establishment of the size threshold that any countervailing interest of the State should yield.

The judgment of the Louisiana Supreme Court affirming the conviction of petitioner Burch is, therefore, reversed, and its judgment affirming the conviction of petitioner Wrestle, Inc., is affirmed. The case is remanded to the Louisiana Supreme Court for proceedings not inconsistent with this opinion.

*Burch*, 441 U.S. at 131–39, 99 S. Ct. 1623 at 1624–28 (emphasis added).

In *Johnson v. Louisiana*, 406 U.S. 380, 92 S. Ct. 1643, (1972), Justice Douglas, joined by Brennan and Marshall, penned a compelling dissent and I believe its sound logic and constitutional reasoning so eloquently laid forth compels that the non-unanimous verdict in *Ramos* will be overturned. The citizens of Louisiana have recently amended our State Constitution abolishing the decades old, racially motivated law that allowed non-unanimous verdicts for twelve-person juries. But this rectification of a decades long wrong will not benefit Mr. Ramos or Defendant because the new law is prospective in its application. This provision is puzzling to me from a constitutional standpoint and I cannot square the thought that Ramos or Defendant or others so convicted, especially those sentenced to life without benefit in the same manner, stand convicted only because it took too long for the citizenry to act. There is hope, however, that having granted certiorari in *Ramos* the U.S. Supreme Court may be persuaded by Douglas' compelling arguments and a consistent application of constitutional jurisprudence affecting the proper outcome of the pending decision. We are not bound, as was the trial court, by the prior

33

decisions on the subject but are free to reason and apply the constitutional law and principles which govern this decision. I believe, as did the majority of people of this state, that the handwriting is on the wall, and the story soon to be written will further rectify decades of wrongful convictions obtained without due process of law as mandated by our fundamental state and federal constitutional requirements.

Set forth at length is the compelling argument of Justice Douglas, joined by Justices Brennan and Marshall in *Johnson*:

> Appellant in the Louisiana case and petitioners in the Oregon case were convicted by juries that were less than unanimous. This procedure is authorized by both the Louisiana and Oregon Constitutions. Their claim, rejected by the majority, is that this procedure is a violation of their federal constitutional rights. With due respect to the majority, I dissent from **this *radical departure from American traditions.***

> The Constitution does not mention unanimous juries. *Neither does it mention the presumption of innocence, nor does it say that guilt must be proved beyond a reasonable doubt in all criminal cases.* Yet it is almost inconceivable that anyone would have questioned whether proof beyond a reasonable doubt was in fact the constitutional standard. And, indeed, when such a case finally arose we had little difficulty disposing of the issue. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368.

> The Court, speaking through Mr. Justice Brennan, stated that:

> (The) use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is *critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned*. It is also important in our free society that **every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.**

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*Ibid.*

*I had similarly assumed that there was no dispute that the Federal Constitution required a unanimous jury in all criminal cases. After all, it has long been explicit constitutional doctrine **that the Seventh Amendment civil jury must be unanimous.** See American Publishing Co. v. Fisher*, 166 U.S. 464, 17 S.Ct. 618, 41 L.Ed. 1079, where the Court said that <u>*'unanimity was one of the peculiar and essential features of trial by jury at the common law. No authorities are needed to sustain this proposition.*</u>' *Id*., at 468, 17 S.Ct., at 619. Like proof beyond a reasonable doubt, the issue of unanimous juries in criminal cases simply never arose. *Yet in cases dealing with juries it had always been assumed that a unanimous jury was required. See Maxwell v. Dow*, 176 U.S. 581, 586, 20 S.Ct. 448, 450, 44 L.Ed. 597; *Patton v. United States*, 281 U.S. 276, 288, 50 S.Ct. 253, 254, 74 L.Ed. 854; *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055. Today the bases of those cases are discarded *and two centuries of American history are shunted aside.*

The result of today's decisions is anomalous: though unanimous jury decisions are not required in state trials, **they are constitutionally required in federal prosecutions. How can that be possible when both decisions stem from the Sixth Amendment? We held unanimously in 1948 that the Bill of Rights requires a unanimous jury verdict:** '<u>*Unanimity in jury verdicts is required where the Sixth and Seventh Amendments apply. In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury.*</u>

A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it.' *Andres v. United States*, 333 U.S., at 748, 68 S.Ct., at 884. After today's decisions, **a man's property may only be taken away by a unanimous jury vote, yet he can be stripped of his liberty by a lesser standard.** <u>*How can that result be squared with the law of the land as expressed in the settled and traditional requirements of procedural due process?*</u>

Rule 31(a) of the Federal Rules of Criminal Procedure states, 'The verdict shall be unanimous.' That Rule was made by this Court with the concurrence of Congress pursuant to 18 U.S.C. s 3771. *After today a unanimous verdict will be required in a federal prosecution but not in a state prosecution.* **Yet the source of the right in each case is the Sixth Amendment**. I fail to see how with reason we can maintain those inconsistent dual positions.

There have, of course, been advocates of the view that the duties imposed on the States by reason of the Bill of Rights operating through the Fourteenth Amendment are a watered-down version of those

guarantees. *But we held to the contrary* in *Malloy v. Hogan*, 378 U.S. 1, 10—11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653:

> We have held that the guarantees of the First Amendment, *Gitlow v. New York* (268 U.S. 652, 45 S.Ct. 625), *supra*; *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301, the prohibition of unreasonable searches and seizures of the Fourth Amendment, *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, and the right to counsel guaranteed by the Sixth Amendment, *Gideon v. Wainwright* (372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799), *supra, are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.* In the coerced confession cases, involving the policies of the privilege itself, *there has been no suggestion that a confession might be considered coerced if used in a federal but not a state tribunal*. **The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.**

*Malloy*, of course, not only applied the Self-Incrimination Clause to the States but also stands for the proposition, as mentioned, that 'the same standards must determine whether an accused's silence in either a federal or state proceeding is justified.' *Id.*, at 11, 84 S.Ct., at 1495. *See also Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678. The equation of federal and state standards for the Self-Incrimination Clause was expressly reaffirmed *in Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, and in *Miranda v. Arizona*, 384 U.S. 436, 464, 86 S.Ct. 1602, 1622, 16 L.Ed.2d 694.

Similarly, when the Confrontation Clause was finally made obligatory on the States, Mr. Justice Black for the majority was careful to observe that its guarantee, 'like the right against compelled self-incrimination, is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment. " *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923. Cf. *Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213.

Likewise, when we applied the Double Jeopardy Clause against the States Mr. Justice Marshall wrote for the Court that *'(o)nce it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' Duncan v. Louisiana* (391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491) . . . *the same constitutional standards apply against both the State and Federal Governments.' Benton v. Maryland*,

395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707. And, the doctrine of coextensive coverage was followed in holding the Speedy Trial Clause applicable to the States. *Klopfer v. North Carolina*, 386 U.S. 213, 222, 87 S.Ct. 988, 993, 18 L.Ed.2d 1.

And, in *Duncan v. Louisiana*, 391 U.S. 145, 158 n. 30, 88 S.Ct. 1444, 1452, 20 L.Ed.2d 491, in holding the jury trial guarantee binding in state trials, *we noted that its prohibitions were to be identical against both the Federal and State Governments*. See also *Id*., at 213, 88 S.Ct., at 1459 (Fortas, J., concurring).

Only once has this Court diverged from the doctrine of coextensive coverage of guarantees brought within the Fourteenth Amendment, and that aberration was later rectified. In *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, it was held that the Fourth Amendment ban against unreasonable and warrantless searches was enforceable against the States but the Court declined to incorporate the Fourth Amendment exclusionary rule of *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. Happily, however, that gap was partially closed in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 and then completely bridged in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. In *Mapp* we observed that *'(t)his Court has not hesitated to enforce as strictly against the States as it does against the Federal Government the rights of free speech and of a free press, the rights to notice and to a fair, public trial . . .'* We concluded that 'the same rule' should apply where the Fourth Amendment was concerned. *Id*., at 656, 81 S.Ct., at 1692. And, later, we made clear that 'the standard for obtaining a search warrant is . . . 'the same under the Fourth and Fourteenth Amendments,'' *Aguilar v. Texas*, 378 U.S. 108, 110, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723; and that the 'standard of reasonableness is the same under the Fourth and Fourteenth Amendments.' *Ker v. California*, 374 U.S. 23, 33, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726.

It is said, however, that the Sixth Amendment, as applied to the States by reason of the Fourteenth, does not mean what it does in federal proceedings, that it has a 'due process' gloss on it, and that that gloss gives the States power to experiment with the explicit or implied guarantees in the Bill of Rights.

Mr. Justice Holmes, dissenting in *Truax v. Corrigan*, 257 U.S. 312, 344, 42 S.Ct. 124, 133, 66 L.Ed. 254, and Mr. Justice Brandeis, dissenting in *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747, thought that the States should be allowed to improvise remedies for social and economic ills. But in that area there are not many 'thou shalt nots' in the Constitution and Bill of Rights concerning property rights. The most conspicuous is the Just Compensation Clause of the Fifth Amendment. It has been held applicable with full vigor to the States by reason of the Fourteenth Amendment. *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979.

Do today's decisions mean that States may apply a 'watered down' version of the Just Compensation Clause? Or are today's decisions limited to a paring down of civil rights protected by the Bill of Rights and up until now as fully applicable to the States as to the Federal Government?

These civil rights—whether they concern speech, searches and seizures, self-incrimination, criminal prosecutions, bail, or cruel and unusual punishments extend, of course, to everyone, but in cold reality touch mostly the lower castes in our society. I refer, of course, to the blacks, the Chicanos, the one-mule farmers, the agricultural workers, the off-beat students, the victims of the ghetto. Are we giving the States the power to experiment in diluting their civil rights? It has long been thought that the 'thou shalt nots' in the Constitution and Bill of Rights protect everyone against governmental intrusion or overreaching. **The idea has been obnoxious that there are some who can be relegated to second-class citizenship**. But if we construe the Bill of Rights and the Fourteenth Amendment to permit States to 'experiment' with the basic rights of people, we open a veritable Pandora's box. **For hate and prejudice are versatile forces that can degrade the constitutional scheme**.

That, however, is only one of my concerns when we make the Bill of Rights, as applied to the States, a 'watered down' version of what that charter guarantees. My chief concern is one often expressed by the late Mr. Justice Black, who was alarmed at the prospect of nine men appointed for life sitting as a super-legislative body to determine whether government has gone too far. The balancing was done when the Constitution and Bill of Rights were written and adopted. For this Court to determine, say, whether one person but not another is entitled to free speech is a power never granted it. But that is the ultimate reach of decisions that let the States, subject to our veto, experiment with rights guaranteed by the Bill of Rights.

I would construe the Sixth Amendment, when applicable to the States, precisely as I would when applied to the Federal Government.

II

The *plurality* approves a procedure which diminishes the reliability of a jury. First, it eliminates the circumstances in which a minority of jurors (a) could have rationally persuaded the entire jury to acquit, or (b) while unable to persuade the majority to acquit, nonetheless could have convinced them to convict only on a lesser-included offense. Second, it permits prosecutors in Oregon and Louisiana to enjoy a conviction-acquittal ratio substantially greater than that ordinarily returned by unanimous juries.

**The diminution of verdict reliability flows from the fact that nonunanimous juries need not debate and deliberate as fully**

**as must unanimous juries.** *As soon as the requisite majority is attained, further consideration is not required either by Oregon or by Louisiana even though the dissident jurors might, if given the chance, be able to convince the majority.* Such persuasion does in fact occasionally occur in States where the unanimous requirement applies: 'In roughly one case in ten, the minority eventually succeeds in reversing an initial majority, and these may be cases of special importance.' One explanation for this phenomenon is that because jurors are often not permitted to take notes and because they have imperfect memories, the forensic process of forcing jurors to defend their conflicting recollections and conclusions flushes out many nuances which otherwise would go overlooked. This collective effort to piece together the puzzle of historical truth, however, is cut short as soon as the requisite majority is reached in Oregon and Louisiana. *Indeed, if a necessary majority is immediately obtained, then no deliberation at all is required in these States.* (There is a suggestion that this may have happened in the 10—2 **verdict rendered in only 41 minutes** in Apodaca's case.) To be sure, in jurisdictions other than these two States, initial majorities normally prevail in the end, but about a tenth of the time the rough-and-tumble of the jury room operates to reverse completely their preliminary perception of guilt or innocence. *The Court now extracts from the jury room this automatic check against hasty fact-finding by relieving jurors of the duty to hear out fully the dissenters.*

It is said that there is no evidence that majority jurors will refuse to listen to dissenters whose votes are unneeded for conviction. Yet human experience teaches that polite and academic conversation is no substitute for the earnest and robust argument necessary to reach unanimity. As mentioned earlier, in Apodaca's case, *whatever courtesy dialogue transpired could not have lasted more than 41 minutes*. <u>*I fail to understand why the Court should lift from the States the burden of justifying so radical a departure from an accepted and applauded tradition and instead demand that these defendants document with empirical evidence what has always been thought to be too obvious for further study.*</u>

To be sure, in *Williams v. Florida*, 399 U.S. 78, 88, 90 S.Ct. 1893, 1899, 26 L.Ed.2d 446, we held that a State could provide a jury less than 12 in number in a criminal trial. We said: 'What few experiments have occurred—usually in the civil area—indicate that there is no discernible difference between the results reached by the two different-sized juries. In short, neither currently available evidence nor theory suggests that the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members.' *Id*., at 101—102, 90 S.Ct., at 1906.

That rational of *Williams* can have no application here. *Williams requires that the change be neither more nor less advantageous to either the State or the defendant*. It is said that such a showing is satisfied here since a 3:9 (Louisiana) or 2:10 (Oregon) verdict will

result in acquittal. **Yet experience shows that the less-than-unanimous jury overwhelmingly favors the States**.

*Moreover, even where an initial majority wins the dissent over to its side, the ultimate result in unanimous-jury States may nonetheless reflect the reservations of uncertain jurors. I refer to many compromise verdicts on lesser-included offenses and lesser sentences. Thus, even though a minority may not be forceful enough to carry the day, their doubts may nonetheless cause a majority to exercise caution. Obviously, however, in Oregon and Louisiana, dissident jurors will not have the opportunity through full deliberation to temper the opposing faction's degree of certainty of guilt.*

The new rule also has an impact on cases in which a unanimous jury would have neither voted to acquit nor to convict, but would have deadlocked. In unanimous-jury States, this occurs about 5.6% of the time. Of these deadlocked juries, Kalven and Zeisel say that 56% contain either one, two, or three dissenters. In these latter cases, the majorities favor the prosecution 44% (of the 56%) but the defendant only 12% (of the 56%). Thus, by eliminating these deadlocks, *Louisiana wins 44 cases for every 12 that it loses, obtaining in this band of outcomes a substantially more favorable conviction ratio (3.67 to 1) than the unanimous-jury ratio of slightly less than two guilty verdicts for every acquittal.* H. Kalven & H. Zeisel, The American Jury 461, 488 (Table 139) (1966). By eliminating the one-and-two-dissenting-juror cases, Oregon does even better, gaining 4.25 convictions for every acquittal. *While the statutes on their face deceptively appear to be neutral, the use of the nonunanimous jury stacks the truth-determining process against the accused.* Thus, we take one step more away from the accusatorial system that has been our proud boast.

*It is my belief that a unanimous jury is necessary if the great barricade known as proof beyond a reasonable doubt is to be maintained.* This is not to equate proof beyond a reasonable doubt with the requirement of a unanimous jury. That would be analytically fallacious since a deadlocked jury does not bar, as double jeopardy, retrial for the same offense. *See Dreyer v. Illinois*, 187 U.S. 71, 23 S.Ct. 28, 47 L.Ed. 79. Nevertheless, one is necessary for a proper effectuation of the other. Compare *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, with *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782.

Suppose a jury begins with a substantial minority but then in the process of deliberation a sufficient number changes to reach the required 9:3 or 10:2 for a verdict. Is not there still a lingering doubt about that verdict? Is it not clear that the safeguard of unanimity operates in this context to make it far more likely that guilt is established beyond a reasonable doubt?

The late Learned Hand said that 'as a litigant I should dread a lawsuit beyond almost anything else short of sickness and death.' At the criminal level that dread multiplies. Any person faced with the awesome power of government is in great jeopardy, even though innocent. *Facts are always elusive and often two-faced. What may appear to one to imply guilt may carry no such overtones to another. Every criminal prosecution crosses treacherous ground, for guilt is common to all men. Yet the guilt of one may be irrelevant to the charge on which he is tried or indicate that if there is to be a penalty, it should be of an extremely light character.*

The risk of loss of his liberty and the certainty that if found guilty he will be 'stigmatized by the conviction' were factors we emphasized in *Winship* in sustaining the requirement that no man should be condemned where there is reasonable doubt about his guilt. 397 U.S., at 363—364, 90 S.Ct., at 1072.

We therefore have always held that in criminal cases we would err on the side of letting the guilty go free rather than sending the innocent to jail. We have required proof beyond a reasonable doubt as 'concrete substance for the presumption of innocence.' Id., at 363, 90 S.Ct., at 1072.

That procedure has required a degree of patience on the part of the jurors, forcing them to deliberate in order to reach a unanimous verdict. Up until today the price has never seemed too high. Now a 'law and order' judicial mood causes these barricades to be lowered.

*The requirements of a unanimous jury verdict in criminal cases and proof beyond a reasonable doubt are so embedded in our constitutional law and touch so directly all the citizens and are such important barricades of liberty that if they are to be changed they should be introduced by constitutional amendment.*

Today the Court approves a nine-to-three verdict. Would the Court relax the standard of reasonable doubt still further by resorting to eight-to-four verdicts, or even a majority rule? Moreover, in light of today's holdings and that of *Williams v. Florida*, in the future would it invalidate three-to-two or even two-to-one convictions? Is the next step the elimination of the presumption of innocence? Mr. Justice Frankfurter, writing in dissent in *Leland v. Oregon*, 343 U.S. 790, 802—803, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302, said:

> It is not unthinkable that failure to bring the guilty to book for a heinous crime which deeply stirs popular sentiment may lead the legislature of a State, *in one of those emotional storms which on occasion sweep over our people*, to enact that thereafter an indictment for murder, following attempted rape, should be presumptive proof of guilt and cast upon the defendant the burden of proving

41

beyond a reasonable doubt that he did not do the killing. Can there be any doubt that such a statute would go beyond the freedom of the States, under the Due Process Clause of the Fourteenth Amendment, to fashion their own penal codes and their own procedures for enforcing them? Why is that so? *Because from the time that the law which we have inherited has emerged from dark and barbaric times, the conception of justice which has dominated our criminal law has refused to put an accused at the hazard of punishment if he fails to remove every reasonable doubt of his innocence in the minds of jurors.* It is the duty of the Government to establish his guilt beyond a reasonable doubt. This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.' Accordingly there can be no doubt, I repeat, that a State cannot cast upon an accused the duty of establishing beyond a reasonable doubt that his was not the act which caused the death of another.

The vast restructuring of American law which is entailed in today's decisions is for political not for judicial action. Until the Constitution is rewritten, we have the present one to support and construe. It has served us well. We lifetime appointees, who sit here only by happenstance, are the last who should sit as a Committee of Revision on rights as basic as those involved in the present cases. Proof beyond a reasonable doubt and unanimity of criminal verdicts and the presumption of innocence are basic features of the accusatorial system. *What we do today is not in that tradition but more in the tradition of the inquisition.* Until amendments are adopted setting new standards, I would let no man be fined or imprisoned in derogation of what up to today was indisputably the law of the land.

*Johnson*, 406 U.S. 380–94, 92 S.Ct. 1643-50 (emphasis added and in original).

In 2000, the late Justice Antonin Scalia wrote in his concurrence in *Apprendi*:

I feel the need to say a few words in response to Justice BREYER's dissent. It sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State-and an increasingly bureaucratic part of it, at that.) *The founders of the American Republic were not prepared to leave it to the State,* which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

As for fairness, which Justice BREYER believes "[i]n modern times," *post,* at 2397, the jury cannot provide: I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is

exposing himself to a jail sentence of 30 years-and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge (just as he may thank the mercy of a tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted). Will there be disparities? Of course. But the criminal will never get *more* punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) **will be determined** *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*

*Apprendi*, 530 U.S. at 498, 120 S. Ct. at 2367 (emphasis added).

It is also very telling that the U.S. Supreme Court earlier this year again made it clear that the rights guaranteed through the Bill of Rights to all American citizens applies to the states through the Fourteenth Amendment. In *Timbs (and 2012 Land Rover) v. Indiana*, 139 S. Ct. 682, 686–87 (2019) the high court unanimously held:

> The question presented: Is the Eighth Amendment's Excessive Fines Clause an "incorporated" protection applicable to the States under the Fourteenth Amendment's Due Process Clause? Like the Eighth Amendment's proscriptions of "cruel and unusual punishment" and "[e]xcessive bail," the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority. This safeguard, we hold, is "fundamental to our scheme of ordered liberty," with "dee[p] root[s] in [our] history and tradition." *McDonald* v. *Chicago*, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (internal quotation marks omitted; emphasis deleted). The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.

Further, the Supreme Court in *Tibbs* clearly stated its present position on the application of the protections accorded in the Bill of rights to the States through the Fourteenth Amendment:

> When ratified in 1791, the Bill of Rights applied only to the Federal Government. *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243, 8 L.Ed. 672 (1833). "The constitutional Amendments adopted in the aftermath of the Civil War," however, "fundamentally altered our country's federal system." *McDonald*, 561 U.S., at 754, 130 S.Ct. 3020. With only "a handful" of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States. *Id.*, at 764–765, and nn. 12–13, 130 S.Ct. 3020. *A Bill of Rights protection is incorporated, we have explained, if it is "fundamental to our scheme of ordered liberty," or "deeply rooted in*

43

*this Nation's history and tradition." Id.,* at 767, 130 S.Ct. 3020 (internal quotation marks omitted; emphasis deleted).

> *Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." Id.,* at 765, 130 S.Ct. 3020 (internal quotation marks omitted). **Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires**.

*Timbs*, 139 S. Ct. at 687.

Moreover, the high court emphasized its historical approach incorporating the Bill of Rights to the States declaring that:

> Indiana's suggestion to the contrary is inconsistent with the approach we have taken in cases concerning novel applications of rights already deemed incorporated. For example, in *Packingham* v. *North Carolina*, 582 U.S. ——, 137 S.Ct. 1730, 198 L.Ed.2d 273 (2017), we held that a North Carolina statute prohibiting registered sex offenders from accessing certain commonplace social media websites violated the First Amendment right to freedom of speech. In reaching this conclusion, we noted that the First Amendment's Free Speech Clause was "applicable to the States under the Due Process Clause of the Fourteenth Amendment." *Id.,* at ——, 137 S.Ct., at 1733. We did not, however, inquire whether the Free Speech Clause's application specifically to social media websites was fundamental or deeply rooted. See also, *e.g.*, *Riley* v. *California*, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) (holding, without separately considering incorporation, that States' warrantless search of digital information stored on cell phones ordinarily violates the Fourth Amendment). Similarly here, regardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged.

*Timbs*, 139 S. Ct. at 690–91.

As I have chronicled above, the U.S. Supreme Court has made it clear that **in the federal system the fundamental right to trial by jury requires a unanimous verdict. It has further held this to be a right so fundamental to our system of justice that most Justices thought it unnecessary to have to rule on the question**. Looking at the high court's ruling requiring the States to have unanimous verdicts in six-person jury trials, it is apparent that the requirement of a unanimous verdict

has always been considered "fundamental to our scheme of ordered liberty, or deeply rooted in this Nation's history and tradition" *Supra*. at 687. The previous decision of the Supreme Court to the contrary concerning twelve-person juries in Louisiana and Oregon is antithetical to these principles and thus I believe the Supreme Court is poised to rectify its previous ruling to the contrary, especially given the current attitude of the entire court concerning the application of the rights guaranteed by the Bill of Rights to the States through the Fourteenth Amendment. Just a few years before *Tibbs* was unanimously decided the Supreme Court in *Hall v. Florida*, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014), overturned a Florida State Supreme Court ruling allowing the execution of an intellectually disabled person in contravention of the U.S. Supreme Court's ruling in *Atkins v. Virginia,* 536 U.S., at 321, 122 S.Ct. 2242. The high court explained its prior holding and emphasized the applicability of the rights guaranteed in the Eighth Amendment to the U.S. Constitution to the States through the Fourteenth Amendment:

> In 2002, this Court ruled that the Eighth Amendment prohibited the execution of persons with intellectual disability. *Atkins v. Virginia,* 536 U.S., at 321, 122 S.Ct. 2242. On November 30, 2004, Hall filed a motion claiming that he had intellectual disability and could not be executed. More than five years later, Florida held a hearing to consider Hall's motion. Hall again presented evidence of intellectual disability, including an IQ test score of 71. (Hall had received nine IQ evaluations in 40 years, with scores ranging from 60 to 80, Brief for Respondent 8, but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80. See App. 107; 109 So.3d 704, 707 (Fla.2012)). In response, Florida argued that Hall could not be found intellectually disabled because Florida law requires that, as a threshold matter, Hall show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability. App. 278–279 ("[U]nder the law, if an I.Q. is above 70, a person is not mentally retarded"). The Florida Supreme Court rejected Hall's appeal and held that Florida's 70–point threshold was constitutional. 109 So.3d, at 707–708.
> . . . .
>
> The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

45

punishments inflicted." The Fourteenth Amendment applies those restrictions to the States. *Roper v. Simmons,* 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *Furman v. Georgia,* 408 U.S. 238, 239–240, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam* ). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper, supra,* at 572, 125 S.Ct. 1183; see also *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

> *The Eighth Amendment "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States,* 217 U.S. 349, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910). To enforce the Constitution's protection of human dignity, this Court looks to the "*evolving standards of decency that mark the progress of a maturing society." Trop, supra,* at 101, 78 S.Ct. 590. The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. *This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.*

> The Eighth Amendment prohibits certain punishments as a categorical matter. No natural-born citizen may be denaturalized. *Ibid.* No person may be sentenced to death for a crime committed as a juvenile. *Roper, supra,* at 572, 125 S.Ct. 1183 And, as relevant for this case, persons with intellectual disability may not be executed. *Atkins,* 536 U.S., at 321, 122 S.Ct. 2242.

> No legitimate penological purpose is served by executing a person with intellectual disability. *Id.,* at 317, 320, 122 S.Ct. 2242. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy v. Louisiana,* 554 U.S. 407, 420, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008).

*Hall*, 572 U.S. at 707–08 (emphasis added).

The people of this state have acted to correct this decades-old injustice because public opinion "bec[ame] enlightened by a humane justice" *Weems*, 217 U.S. at 378, demonstrating the "evolving standards of decency that mark the progress of a maturing society." *Hall*, 572 U.S. 707. The people of Louisiana rejected the old law based on bigotry and racism so long used to obtain guilty

verdicts in derogation of the fundamental right to a true trial by jury where a unanimous verdict demonstrates defendants' guilt is beyond a reasonable doubt. We have the opportunity, if not the obligation, to rightly apply the constitutional mandate embodied in the Sixth Amendment to the U.S. Constitution and to rightly apply the jurisprudence which more correctly applied the constitutional requirements than was done in *Apodaca*. The U.S. Supreme Court is poised to act, but I believe Louisiana should not await their instruction but should take this opportunity to show the same courage the citizens of our state have most recently shown. As the learned dissenters, Justices Stewart, Brennan and Marshall cogently explained in *Apodaca* almost fifty years ago:

> **[I]t has been universally understood that a unanimous verdict is an essential element of a Sixth Amendment jury trial**. *See Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055; *Patton v. United States*, 281 U.S. 276, 288, 50 S.Ct. 253, 254, 74 L.Ed. 854; *Hawaii v. Mankichi*, 190 U.S. 197, 211—212, 23 S.Ct. 787, 788, 47 L.Ed. 1016; *Maxwell v. Dow,* 176 U.S. 581, 586, 20 S.Ct. 448, 450, 44 L.Ed. 597; *Thompson v. Utah*, 170 U.S. 343, 351, 353, 18 S.Ct. 620, 623, 42 L.Ed. 1061; cf. 2 J. Story, *Commentaries on the Constitution* s 1779 n. 2 (5th ed. 1891). I would follow these settled Sixth Amendment precedents and reverse the judgment before us.

*Apodaca*, 406 U.S. at 414–15 (emphasis added).

*I believe that it is also telling in this case that the record shows the jury retired from the courtroom, reached a decision, and was re-seated in the courtroom to deliver its verdict all within one hour*. Thus, it appears, the voices of the dissenting jurors were quickly silenced upon the jury reaching the required ten votes. As the dissenters noted in *Johnson*, the jury in *Apodaca* only engaged in discussion for forty-one minutes. The trial court here instructed the jury that when ten jurors agree on a verdict the process could stop. It is true that the trial court also encouraged the jury in its instructions to engage in full and complete discussion of the matter, but it is obvious that the latter "encouragement" did not prevail,

underscoring the very problem identified by the dissenters in *Johnson*: "Obviously, however, in Oregon and Louisiana, dissident jurors will not have the opportunity through full deliberation to temper the opposing faction's degree of certainty of guilt." *Johnson*, *Supra*.

For these reasons I believe this non-unanimous jury verdict is unconstitutional as violative of the Sixth Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment. Our courts should join with our citizenry and no longer allow the "versatile forces" of hate and prejudice to "degrade the constitutional scheme" of trial by jury and due process of law.

Consequently, I believe this conviction cannot stand. It should be reversed, vacated, and remanded to the district court for a new trial. For these reasons I respectfully dissent.